**Leora K. MOSES, Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee,**

**and**

**Burleigh County Sheriff's Department, Respondent.**

Civ. No. 880027.

Supreme Court of North Dakota.

Sept. 20, 1988.

Dietz & Little, Bismarck, for appellant; argued by Janell M. Knutson. Appearance by Stephen D. Little.

Hugh Patrick Seaworth (argued), Asst. Atty. Gen., North Dakota Workers Compensation Bureau, Bismarck, for appellee.

MESCHKE, Justice.

Leora K. Moses appealed from dismissal of her claim by the North Dakota Workers Compensation Bureau. The district court affirmed, but we reverse and remand with directions to determine the percent of aggravation pursuant to NDCC 65–05–15.

Moses worked as a deputy sheriff at the Burleigh County jail. During each eight-hour shift, she climbed nine flights of stairs about 35 times. Moses began to experience discomfort in her knees in December 1984, and sought treatment in February 1985 from Dr. Lunn, an internist. Medication was prescribed, but did not alleviate the condition, diagnosed as bilateral chondromalacia patellae, a softening of cartilage behind each kneecap. Dr. Lunn estimated a period of disability during March 13–25, 1985. Believing that her condition arose from her employment activities, Moses applied for workers compensation benefits. The Bureau dismissed her claim.

Moses petitioned for a rehearing and the Bureau asked for further information. In a deposition, Dr. Lunn testified that the activity required in Moses' work aggravated her chondromalacia, as would a number of other factors, such as strenuous physical activities or obesity. Dr. Lunn carefully concluded: "There is no way I could say 100 percent for certain that going up and down stairs caused it. But at the time I saw her that was what aggravated her pain. It really made it worse."

Moses' counsel then suggested an appointment with an orthopedic surgeon. The Bureau scheduled an appointment with Dr. Flannery in January 1986, which Moses did not keep because she moved to California. Dr. Flannery had examined Moses in October and December of 1985 and had diagnosed her condition as attributable to quadriceps malalignment. At that time he advised her to minimize stair climbing.

The Bureau had Dr. Flannery evaluate Moses' condition on the basis of her previous examination, file and x-rays. His brief letter said:

"I think that Ms. Moses has an element of chondromalacia which means injury to the articular surface of the knee cap and this always follows on quadriceps malalignment. I do not think her employment caused her knee problem, but the stair climbing aggravated it."

Moses next asked the Bureau to approve her examination by an orthopedic surgeon in California. There, Dr. Barer reviewed Moses' medical file and examined her in December 1986. He agreed with the diagnosis of bilateral chondromalacia patellae, but discounted the presence of quadriceps malalignment. Dr. Barer wrote that "the jogging aspects of [Moses'] recreational activities" were a more likely cause of her knee problems than her mild obesity, but did not discuss her job-related stair climbing.

Based on the letter from Dr. Barer, the Bureau's in-house medical advisor recommended dismissal of Moses' claim again. In early February 1987, the Bureau told Moses that it would review the record and issue its final decision. Moses requested that Dr. Flannery be deposed on the issue of causation, but the Bureau denied her request. In March, Moses again requested a deposition of Dr. Flannery and further investigation into Dr. Barer's statements.

In April, the Bureau contacted Dr. Barer to elaborate on Moses' condition. He replied:

"I would think that there is likely another factor in causing the chondromalacia patella other than stair climbing. An excessive amount of stair climbing could hasten the entity already present.... Finally, in answer to your last question as to whether or not I believe that the chondromalacia patella is likely to have been caused or aggravated by a non-work related factors [sic], I would have to answer this in the affirmative ..."

In May, Moses requested the opportunity to cross-examine any evidence that the Bureau intended to rely on in its decision. The Bureau refused to pay costs for further discovery or expert witness fees. It did offer either a telephone hearing or the acceptance of Moses' testimony by affidavit. Moses demanded a final order.

In August 1987, the Bureau issued an Order Affirming Dismissal. The Bureau concluded: "The evidence does not indicate that the disease was caused or aggravated at its inception by employment related activity." Moses appealed to the district court, which affirmed the dismissal. Moses appealed.

Moses argued that she sustained a compensable work-related injury, that the Bureau failed to meet its statutory duty to ascertain the rights of the parties, and that the Bureau violated her statutory and constitutional rights to cross-examination of witnesses.

NDCC 28–32–19 requires that an agency decision be affirmed unless:

"1. The decision or determination is not in accordance with the law.

"2. The decision is in violation of the constitutional rights of the appellant.

"3. Provisions of ... chapter [28–32] have not been complied with in the proceedings before the agency.

"4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

"5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

"6. [Or,] [t]he conclusions and decision of the agency are not supported by its findings of fact."

In an appeal of an administrative agency decision, we review the record compiled by the agency. *Olson v. North Dakota Workers Comp. Bureau*, 419 N.W.2d 894, 896 (N.D.1988). We consider whether the Bureau could have reasonably reached its factual determinations by the greater weight of all of the evidence. *Syverson v. North Dakota Workmen's Comp. Bureau*, 406 N.W.2d 688, 690 (N.D.1987):

"Moreover, because the adversary concept has only limited application to claims for workmen's compensation benefits, the Bureau may not rely only upon that part of inconsistent medical evidence which is favorable to the Bureau's position without attempting to clarify the inconsistency."

Moses must show, by a simple preponderance of the evidence, a compensable injury in order to participate in the fund. NDCC 65–01–11. NDCC 65–01–02(7) defines a "compensable injury" as,

"an injury by accident arising out of and in the course of employment.... Such term, in addition to an injury by accident, includes:

"a. Any disease which can be fairly traceable to the employment. Ordinary diseases of life to which the general public outside of the employment is exposed shall not be compensable except where the disease follows as an incident to, and in its inception is caused by a hazard to which an employee is subjected in the course of his employment. The disease must be incidental to the character of the business and not independent of the relation of employer and employee.... It need not have been foreseen or expected, but after it is contracted, it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence."

NDCC 65–01–02(12) says that "fairly traceable to the employment" means only a "disease" that:

"a. Arises under conditions wherein it is apparent to the rational mind upon consideration of all the circumstances that there is a direct casual connection between the conditions under which the work is performed and the disease;

"b. Can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment;

"c. Can be fairly traced to the employment[.]"

We have held that "an injury ... which can be medically related to repeated stress or strain in a claimant's usual work exertions, is a compensable injury under the North Dakota Workmen's Compensation Act." *Satrom v. North Dakota Workmen's Comp. Bureau,* 328 N.W.2d 824, 828 (N.D.1982). Even aggravation of a preexisting condition is compensable on a proportionate basis. NDCC 65–05–15.

In *Satrom, supra,* a hairdresser suffered from acute disc syndrome. Despite medical testimony that described her work activities as "the main contributing factor," the Bureau denied her claim. It found that her "home activities, ... contributed more significantly ... to her ... injury than did her job-related duties." *Id.* at 829. We reversed the denial of her claim, observing, "It is sufficient if the work-related stress is a 'substantial contributing factor' to the injury." *Id.* at 831. We went on to say:

"We believe our case law clearly indicates that in cases ... where expert medical testimony is desirable if not essential to a determination of causation, the Bureau may not simply ignore competent medical testimony without expressly setting forth in its findings of fact adequate reasons, which are supported by the record, for doing so." *Id.* at 832.

Here, the Bureau gave no reasons for ignoring the testimony of all three doctors that stair climbing aggravated Moses' chondromalacia.

The Bureau recognized that there was evidence to support Moses' claim, but insisted that the greater weight of the evidence did not support her claim. The Bureau argued that stair climbing did "not *necessarily* cause the condition," (Bureau's emphasis) and further asserted that it "did everything it could, within reason, ... to fairly determine" her claim. We cannot agree.

Dr. Lunn, whom Moses originally consulted, wrote in his report to the Bureau that "she must do a lot of climbing up and down stairs. This markedly aggravates the discomfort." The Bureau nevertheless dismissed the claim with a finding that "[t]here is no substantiation that the claimant's chrondromalacia [sic] or knee pain is in any way causally related to her employment."

After Moses petitioned for a rehearing, the Bureau informed her attorney that "the crucial evidence will be medical evidence, addressing whether the claimant's bilateral chondromalacia is caused or precipitated by her employment." In the deposition of Dr. Lunn, when asked about the cause of the chondromalacia vis-a-vis climbing stairs, he responded that "I don't know if it necessarily would cause that; it could certainly aggravate it."

The Bureau adopted the view that Dr. Lunn's deposition was "studded with uncertainties." The Bureau decided to seek further expert opinion because it said, "[t]he Bureau is charged with a duty to clear up uncertainties and where reasonable, follow-up on suggested courses of investigation." The expert, Dr. Flannery, based his report on his previous examinations of Moses. He did not address the questions that the Bureau requested he consider. He wrote, "I do not think her employment caused her knee problem, but the stair climbing aggravated it." Again, the expert medical opinion clearly linked job-related aggravation to Moses' symptoms.

In December 1986, the Bureau contacted Dr. Barer in California with several questions, none of which referred to stair climbing:

"The Bureau requests your medical opinion regarding the original diagnosis of bilateral chondromalacia. Are you in

agreement with that diagnosis? Does obesity have anything to do with her knee problems? Does quadiceps [sic] malalignment have anything to do with it? Information in the file indicates Ms. Moses played racquetball and jogged about one mile three times each week in addition to playing basketball. Do you feel that any of those activities could have caused her knee problems or is it your opinion that they were caused by her employment situation alone? Are restrictions/limitations applicable? Is a course of treatment indicated?"

In his response, Dr. Barer confirmed the diagnosis of bilateral chondromalacia. He did not believe that Moses' weight was connected to her knee problems. He said that her jogging "could be an underlying cause for her chondromalacia," but he did not mention the impact of stair climbing on her knees.

The Bureau then asked Dr. Barer to answer a new set of questions, this time including stair climbing:

"First is chondromalacia a disease? Is it common to the public? ... [A]re you able to tell whether the s [sic] stair climbing or some other factor is the *most likely* cause of Ms. Moses' knee condition at its inception? If so, what is your opinion? Can you tell whether the stair climbing significantly hastened or lighted up the knee condition? Do you believe that the knee condition is just as likely to have been caused or aggravated by a non-work related factor."

He responded, "I would think that there is likely another factor in causing the chondromalacia patella other than stair climbing. *An excessive amount of stair climbing could hasten the entity already present.*" (emphasis added).

A third physician had linked Moses' stair climbing to aggravation of her chondromalacia. Yet in affirming its dismissal, the Bureau found:

"The evidence does not indicate that the disease was caused or aggravated at its inception by employment related activity. The evidence does not indicate that the disease is fairly traceable to or otherwise causally related to claimant's employment even accepting the fact that claim-

ant's work included repeated climbing and descending stairs."

The Bureau ignored the testimony of all three doctors indicating aggravation of Moses' chondromalacia by stair climbing, instead finding:

"[t]he evidence indicates that the claimant's symptomatic aggravation is just as likely to have resulted from non-work related activities such as playing softball. The record lacks any substantial evidence of any work-related trauma to the claimant's knees."

But it is obvious that Moses suffered considerable impact to her knees from the repetitive climbing of stairs during her work. It is not disputed that, on each shift, Moses climbed a total of 315 flights of stairs. Conditions and diseases comparable to Moses' chondromalacia are generally "held compensable as occupational diseases, when produced or aggravated by the distinctive conditions or exertions of the employment." 1B Larson's Workmen's Compensation Law § 41.42 (1987).

The "findings of fact made by the agency are not supported by a preponderance of the evidence," as NDCC 28–32–19 requires. From all of the evidence before the Bureau, we do not believe that it could be reasonably concluded that Moses' employment activities were not a "substantial contributing factor" to her condition. *See Satrom, supra,* and *Syverson, supra.* By ignoring the effect of the distinctive conditions of her job, the Bureau did not make a just determination of Moses' claim.

Because of our disposition, we deem it unnecessary to discuss Moses' other contentions. We reverse the Bureau's dismissal of Moses' claim. We remand for determination of the percent of aggravation pursuant to NDCC 65–05–15.

ERICKSTAD, C.J., and LEVINE and GIERKE, JJ., concur.

VANDE WALLE, J., concurs in result.