Leora K. MOSES, Plaintiff, Appellant
and Cross Appellee,

v.

BURLEIGH COUNTY and Bob Harvey,
personally and in his official capacity
as Burleigh County Sheriff, Defendants, Appellees, and Cross Appellants.

Civ. No. 880042.

Supreme Court of North Dakota.

March 28, 1989.

Dietz & Little, Bismarck, for plaintiff, appellant, and cross appellee, argued by Kathryn L. Dietz. Appearances by Stephen D. Little and Leora Moses.

Kapsner & Kapsner, Bismarck, for defendants, appellees, and cross appellants, argued by John C. Kapsner. Appearance by Bob Harvey.

MESCHKE, Justice.

Leora Moses appealed a judgment dismissing her suit against the Sheriff of Burleigh County for breach of an employment contract and for race and sex discrimination. We reverse and remand for a jury trial.

Moses, a black woman, was employed by the Sheriff from April 1983 until she resigned in January 1986. Sheriff's employees customarily began in the jail and moved to other police work. Moses worked in the jail for her entire employment.

When Moses was hired, the Sheriff was expecting improvements to his jail, including addition of a women's detention section. The Sheriff claimed that Moses and another woman were hired solely for detention work, eventually in the new women's section. Moses claimed that she understood only that she would begin in the jail, with nothing said to preclude training, transfer, or advancement.

Moses made numerous oral requests for sidearm training and for peace officer training to prepare herself for transfer to other duties. She eventually received sidearm training. White male deputies hired later than Moses received peace officer training, but she did not.

Moses sued the Sheriff and Burleigh County in October 1985. She claimed that she was discriminated against in her employment because of race and sex in violation of NDCC 14–02.4–03; that her employment contract was broken by failure to furnish her peace officer training; and that she was denied due process because a deputy sheriff was statutorily entitled to peace officer training. In her amended complaint, Moses sought only damages. The Sheriff and County denied any breach of contract or discrimination, asserting that Moses "received all training prescribed for local correctional officers...."

After trial without a jury, the trial court found that Moses "clearly proved certain unequal treatment (such as her failure to obtain peace officer training while other whi[t]e males similarly situated received it)." The trial court also found that the Sheriff and County had proved "that there was a rational basis in the employment contract justifying that treatment" since Moses "agreed to the same within the terms of her contract." The trial court determined that "Moses accepted the employment contract knowing that peace officer training would not be offered to her and that it would not be required for her continued employment as a detention officer." The trial court found that "[s]uch training is not required by or a benefit to a correctional officer," although it "would have been of use or benefit" to Moses for transfer "to other divisions within the Burleigh County Sheriff's Department." The trial court concluded: "There has been no discriminatory act or practice by either Defendant. Any difference in treatment arises from the nature and terms of the employment contract [she] entered into...."

The trial court also held that Moses's "contract of employment was ... terminable at will" and that "[n]o promises or offers of subsequent transfer were made to her" when she was hired. The trial court concluded that there was no breach of contract and, "[a]s there is no contractual right either to continuing employment or to employment other than on the terms of

[her] contract" as a detention deputy, "there has been no violation of [Moses's] substantive due process rights...."

On appeal, Moses challenged the determination that "[t]here has been no discriminatory act or practice by either Defendant." She complained that there was "massive uncontradicted evidence of both racial and sexual hostility" in which "Moses' supervisors, while observing the pervasive racial hostility, acquiesced, when not actually actively participating." Principally, Moses focused on the "refusal to transfer (or promote) women and Blacks from the detention division," emphasizing that "[e]ven the [trial] court recognized that this treatment was unequal because it was inconsistent with the practice of moving white male deputies out of the detention division."

Moses particularly attacked the trial court's findings that her unequal treatment was justified by "the nature and terms of [her] employment contract" and that "it was a bona fide occupational qualification to [restrain] a female employee in anticipation of the development of a separate female detention facility." She pointed to the trial court's explanation that "whether [the Sheriff's] belief [about hiring females for female detention] was legally correct was not ... a legal issue presented ... for decision and was not pleaded or briefed as an issue by either side." Therefore, Moses insisted, there was no relevant question of a bona fide occupational qualification. She argued that the trial court improperly weighted her initial hiring because "the law does not recognize as a defense to unequal treatment in employment that an employee can contract away the right not to be discriminated against." In sum, Moses argued that gender had nothing to do with equal consideration for training and transfer to other positions.

Moses also argued that, as an appointed deputy sheriff, she was statutorily entitled to "basic law enforcement training" mandated for "[e]very newly elected or appointed peace officer."

Moses asked us "to apply ... (the proper legal) standards and remand ... for the award of appropriate relief."

The Sheriff and County argued that the trial court's finding, that Moses was employed as a "correctional officer" and was not required to have peace officer training, was not clearly erroneous. Since Moses was "hired to be a correctional officer only," was without training, and "was terminable at any time," the Sheriff and County argued that she was not "legally entitled" to be considered for transfer to another law enforcement job. Disregarding the clear finding of disparate treatment, discounting evidence about racial and sexual harassment as merely "insensitive and thoughtless" or "juvenile and loutish", and casting about for an acceptable description, the Sheriff and County declared Moses's "assertions of unequal treatment to be incorrect or irrelevant or insignificant or lacking any racial or sexual bias."

The Sheriff and County cross-appealed, claiming they were wrongfully denied a jury trial because Moses sought only money damages and no equitable remedies. "Should this Court not affirm the decision of the trial court," they requested a trial by jury.

## DISCRIMINATION

In 1983, the North Dakota Legislature adopted a Human Rights Act, declaring a broad policy "to prohibit discrimination on the basis of race, color, religion, sex, national origin, age" and other improper factors. NDCC 14–02.4–01. This human rights policy is expressly intended "to prevent and eliminate discrimination in employment relations" and in other commercial and governmental activities. *Id.* The policy is also intended "to deter those who aid, abet, or induce discrimination, or coerce others to discriminate." *Id.*[1]

---

1. NDCC 14–02.4–01 says:
   "*State policy against discrimination.* It is the policy of this state to prohibit discrimination on the basis of race, color, religion, sex, national origin, age, the presence of any mental

   or physical disability, or status with regard to marriage or public assistance; to prevent and eliminate discrimination in employment relations, public accommodations, housing, state and local government services, and credit

Implementing this wholesome policy, the Legislature condemned a wide spectrum of discriminatory practices by an employer. NDCC 14–02.4–03.[2] Specifically, it is a discriminatory practice for an employer "to accord adverse or unequal treatment to a person or employee with respect to ... training, ... promotion, upgrading, ... or a term, privilege, or condition of employment, because of race, color, religion, sex, national origin, ..." or the like. *Id.*

The trial court found that Moses "clearly proved certain unequal treatment (such as her failure to obtain certain peace officer training while other whi[t]e males similarly situated received it)." Thus, the trial court determined that the Sheriff discriminated against Moses on training and transfer.

■ Without more, that clear finding would end the inquiry. But, in an effort to finesse unsettled issues about allocating burdens of proof under the Human Rights Act,[3] the trial court went on to also determine that Moses had agreed to the unequal treatment "within the terms of her contract" and that the Sheriff and County had thus "met their burden of proof by showing that there was a rational basis in the employment contract justifying that treatment." Although the terms of Moses's hiring were mostly inferred from fragmentary testimony about a brief oral interview, the trial court found a contractual term in the initial hiring that justified later discrimination as to training and transfer. Therefore, we must consider whether unlawful discrimination can be justified by a prior contract.

We conclude that a contract cannot excuse later unlawful discrimination. The enactment of the Human Rights Act identified important public interests in eradicating discrimination and designated remedies

transactions; and to deter those who aid, abet, or induce discrimination, or coerce others to discriminate."

2. NDCC 14–02.4–03 says:

"*Employer's discriminatory practices.* It is a discriminatory practice for an employer to fail or refuse to hire a person; to discharge an employee; or to accord adverse or unequal treatment to a person or employee with respect to application, hiring, training, apprenticeship, tenure, promotion, upgrading, compensation, layoff, or a term, privilege, or condition of employment, because of race, color, religion, sex, national origin, age, physical or mental handicap, or status with respect to marriage or public assistance. This chapter does not prohibit compulsory retirement of any employee who has attained sixty-five years of age, but not seventy years of age, and who, for the two-year period immediately before retirement, is employed in a bona fide executive or high policymaking position, if the employee is entitled to an immediate nonforfeiture annual retirement benefit from a pension, profit-sharing, savings, or deferred compensation plan, or any combination of those plans, of the employer of [sic] the employee, which equal, in the aggregate, at least twenty-seven thousand dollars."

3. Moses urged the trial court to apply the burden shifting procedures spelled out in a federal Title VII decision, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

"The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications....

"The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection....

"[R]espondent must, ... be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext...." 411 U.S. at 802–804, 93 S.Ct. at 1824–25. (Footnotes omitted).

This formula has been applied to transfers and promotions, as well as to hirings. *See Diaz v. American Telephone & Telegraph*, 752 F.2d 1356, 1359 (9th Cir.1985).

The Sheriff and County argued that the traditional burden of proof remained upon the claimant throughout to affirmatively prove discrimination.

The trial court avoided a decision on allocating the burden of persuasion:

"Although I believe that, without clear direction from the Legislature, the traditional approach will be adopted by the Supreme Court of North Dakota, that question need not clearly be answered by me for the simple reason that [Moses] has failed in this case under either procedure."

*See Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619 (Minn.1988). *See also* NDRCivP 8(c) on affirmative defenses.

for violation of an individual's rights to be free of discrimination. An accepted principle of interpretation attaches a paramount purpose to such a declaration of public policy. *See* Restatement (Second) on Contracts § 178 (1981); *Krein v. Marian Manor Nursing Home,* 415 N.W.2d 793 (N.D. 1987); and NDCC 1–02–28 ("The benefit [of the provisions of this code] may be waived by any party entitled thereto, unless such waiver would be against public policy.") When an important public policy would be frustrated by a promise, the policy outweighs enforcement of the promise.

To permit a contractual term to vary the intent of a law against discrimination in commercial and contractual matters would make the law ineffective. If an employer could require waiver of an anti-discrimination law as a condition of employment, it could become a widespread practice, increasing discrimination rather than doing away with it. It would be nearly impossible to enforce anti-discrimination laws in employment. Intrinsically, a law against discrimination outlaws contradictory contracts.

■ Of course, a clear subsequent contract may properly waive or settle prior discriminatory conduct. *See,* for example, *Rogers v. General Electric Company,* 781 F.2d 452 (5th Cir.1986). That circumstance must be distinguished from the proscription against contractual waiver of unlawful discrimination in advance of the conduct.

This principle, that discrimination is non-negotiable and cannot be disclaimed in advance, has become well-known in parallel federal civil rights litigation. A key decision was *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), where the United States Supreme Court considered enforcement of an individual's rights to equal employment opportunities under Title VII of the Federal Civil Rights Acts of 1964. A black employee unsuccessfully arbitrated his discharge as required by a collective-bargaining agreement between the company and his union. When he later sued under Title VII, alleging that his discharge resulted from a racially discriminatory employment prac-

tice, the trial court granted the company's motion for summary judgment and dismissed the suit. The trial court held that the employee was bound by the unfavorable arbitral decision under his employment contract. The Court of Appeals affirmed, but the United States Supreme Court reversed.

As part of its analysis, the Supreme Court considered whether the employee had waived his rights under Title VII by virtue of the collective-bargaining agreement governing his employment. The Supreme Court held that he had not.

"To begin, we think it clear that there can be no prospective waiver of an employee's rights under Title VII.... Title VII, ... concerns not majoritarian processes, but an individual's right to equal employment opportunities. Title VII's strictures are absolute and represent a congressional command that each employee be free from discriminatory practices. Of necessity, the rights conferred can form no part of the collective-bargaining process since waiver of these rights would defeat the paramount congressional purpose behind Title VII. In these circumstances, an employee's rights under Title VII are not susceptible of prospective waiver." 415 U.S. at 51–52, 94 S.Ct. at 1021.

Thus, there can be no contract for unlawful discriminatory treatment. This view has been applied in a number of decisions, often citing *Alexander. See Kewin v. Board of Education of Melvindale,* 65 Mich.App. 472, 237 N.W.2d 514 (1975) (a four-month maternity leave mandated by a collective-bargaining agreement held unconstitutional, citing *Alexander* ); *Driessen v. Freborg,* 431 F.Supp. 1191 (D.C.N.D. 1977) (Discharge under maternity leave provision in teachers' contract violated due process, citing *Kewin, supra* ); *Horne v. New England Patriots Football Club,* 489 F.Supp. 465, 470 (D.C.Mass.1980) (arbitration clause in employment agreement does not stay age discrimination claim, citing *Alexander* ); *Campbell v. Connelie,* 542 F.Supp. 275, 279 (D.C.N.Y.1982) (age discrimination claim not waived by joining age

55 retirement plan, citing *Alexander*); *United States v. Trucking Employers, Inc.*, 561 F.2d 313, 319 (C.A.D.C.1977) ("Under Title VII, there can be no prospective waiver. * * * "An employer cannot ... circumvent its responsibility for future acts of purposeful discrimination."—citing *Alexander* for both statements); *U.S.E.E.O.C. v. County of Calumet*, 686 F.2d 1249, 1256 (7th Cir.1982) (collective bargaining agreement, retirement fund, and county personnel policy did not prospectively waive ADEA claim for forced retirement, citing *Alexander*); *Williams v. Vukovich*, 720 F.2d 909, 926 (6th Cir.1983) (Consent decree about racial discrimination in police department contained impermissible waivers of future discrimination, citing *Alexander*); *Schwartz v. Florida Board of Regents*, 807 F.2d 901, 906 (11th Cir.1987) (Settlement agreement was not a waiver of future Equal Pay Act or Title VII claims, citing *Alexander*).

*See also Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 740, 101 S.Ct. 1437, 1445, 67 L.Ed.2d 641 (1981) following *Alexander* and holding that minimum wage provisions of the Fair Labor Standards Act "cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate;" *McDonald v. City of West Branch*, 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), holding that an unappealed arbitration award did not preclude an employee's § 1983 action for unconstitutional discharge, relying on *Alexander*, and saying, 104 S.Ct. at 1804, footnote 12, that, "because preclusion of a judicial action would gravely undermine the effectiveness of § 1983, we must reject ... reliance on and deference to the provisions of the collective-bargaining agreement;" and *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985), at footnote 8, citing

*Alexander* as distinguishing "rights which could be waived by contract between the parties, on the one hand, from an individual's substantive right derived from an independent body of law that could not be avoided by a contractual agreement, on the other."

■ Thus, the trial court misconstrued the Human Rights Act when it held that the disparate treatment of Moses was satisfactorily explained by "the nature and terms of the employment contract [she] entered into...." For work in women's detention, the Sheriff might have properly contemplated her gender as an initial hiring qualification. *See Torres v. Wisconsin Department of Health and Social Services*, 859 F.2d 1523 (7th Cir. en banc; 1988). But his contract with her could not lawfully confine her later employment opportunities to be fairly considered for training, transfer and advancement without regard to her race or sex. Whether there was a bona fide occupational qualification for her position in detention was not significant because Moses was trying to transfer out of detention. The Sheriff's understanding of his hiring "contract" with her could not be a legitimate, nondiscriminatory reason to refuse her training and transfer if she was equally qualified as white male applicants later hired for training and transfer. If Moses was not considered for training and transfer because of her race or sex, she was a victim of discrimination.

Findings of fact influenced by an erroneous view of the law are clearly erroneous. *Estate of Zins by Kelsch v. Zins*, 420 N.W. 2d 729 (N.D.1988). Therefore, we reverse and remand for a new trial on Moses's discrimination claim. The Sheriff and County may be able to show a legitimate and nondiscriminatory reason for inhibiting Moses's training and transfer, even if the trial court did not find another one.[4] If so,

---

**4.** The trial court did notice another circumstance, but did not find it important:

"During the course of her employment she incurred the additional problem of a medical condition, specifically a knee condition, which undoubtedly increased her apprehension about her employment security. This

medical condition and difficulty with employment was confirmed by her physician, but it has no affect [sic] on the contract or the discrimination case. The Court feels that the physical condition aggravated her frustration within her employment and may have had some bearing on her retrospective view of the

Moses will be free to show that any claimed reason was in fact a pretext.

### TRAINING

■ The scope of our holding here about discrimination should not be misunderstood. We do not hold that, under the Human Rights Act, a sheriff must furnish peace officer training to every new employee. We hold only that a sheriff cannot unfairly refuse to consider training and transfer for a person while later hiring applicants of another race or sex into the same division for training and transfer. Of course, a sheriff may effect non-discriminatory policies about peace officer training insofar as the Human Rights Act is concerned.

■ But Moses also claimed that her failure to receive training was unlawful for another reason. She claimed that the Sheriff breached a statutory term of her employment as a deputy sheriff by withholding law enforcement training. NDCC 12–62–08 [5] mandates "basic law enforcement training" for "[e]very newly elected or appointed peace officer." Moses argued that, as an "appointed Deputy Sheriff" of Burleigh County, she was a "peace officer" for whom training was mandated. She stressed statutory definitions of "peace officer" in NDCC 12.1–01–04(17) ("a public servant authorized ... to enforce the law ...") and in NDCC 29–05–10 ("sheriff of a county or his deputy"). Moses also called attention to several paragraphs of a Policy and Procedure Manual of the Burleigh County Sheriff's Department Detention Facility, one designating its employees as peace officers and one which said:

> "All full-time Detention Personnel will successfully complete the basic police training course within the first year of employment."

The Sheriff and County argued that, as a "local correctional officer," Moses's training requirements were governed by NDCC 12–62–06,[6] rather than by NDCC 12–62–08 as a "peace officer." The Sheriff and County argued that the statutory definitions of "peace officer" in NDCC 12.1–01–04(17),[7] and in Administrative Code 10–06–02–01(10),[8] were limited to "only persons who are authorized to conduct criminal investigations," and that other statutory definitions were irrelevant to interpretation of NDCC 12–62–08. They also pointed to the statutory meaning of "jail staff" as "custodial personnel with titles such as jailer, deputy, counselor, correctional officer, or any other title, whose duties include the ongoing supervision of the inmates in a jail," NDCC 12–44.1–01(6), to argue that "the title deputy [was] perfectly compatible with a job where duties are custodial in nature and in which criminal investigation is not authorized." Policy Manual provisions were explained as non-binding guide-

---

nature of that employment. However, the medical condition was related to the physical layout of the Burleigh County jail and that physical layout was known to the Plaintiff at the time the contract of employment was offered to and accepted by her."

See *Moses v. N.D. Workers Comp. Bureau*, 429 N.W.2d 436 (N.D.1988). *See also Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793 (N.D.1987).

**5.** NDCC 12–62–08 says:

"*Peace officers—Training.* Every newly elected or appointed peace officer, except prosecutors, shall within the first year of employment attend a course of training which is certified by the division as meeting the basic law enforcement training requirements. A peace officer who has met the basic training requirements shall be exempt from the provisions of this section."

**6.** NDCC 12–62–06 says:

"*Correctional officers—Training.* Every newly appointed local correctional officer shall within the first year of employment attend a course of training conducted by the division. The curriculum, location, and dates of such sessions shall be determined by the peace officer standards and training board and in cooperation with the sheriff's association."

**7.** NDCC 12.1–01–04(17) says:

" 'Law enforcement officer' or 'peace officer' means a public servant authorized by law or by a government agency or branch to enforce the law and to conduct or engage in investigations or prosecutions for violations of law."

**8.** N.D.A.C. 10–06–02–01(10) (1983) says:

" 'Peace officer' means a public servant authorized by law or by a government agency or branch to enforce the law *or* to conduct or engage in investigations or prosecutions for violations of law." (Our emphasis).

lines. The Sheriff and County submitted that Moses's "job title and her job function did not create ... a requirement" for peace officer training and that her "employment contract did not contain a term granting her peace officer training."

Without analyzing or interpreting related statutes, the trial court determined as a matter of fact that Moses "was employed to serve as a correctional officer in detention," and that "peace officer standard training" was "not required by or a benefit to a correctional officer."

Sections 12–62–06 and 12–62–08 were enacted in 1981 as a part of a comprehensive training program for the criminal justice system. Chapter 12–62 of the North Dakota Century Code does not define "peace officer." Neither the legislative history of chapter 12–62 on criminal justice training nor regulations about it published by the attorney general, who supervises the criminal justice training program, NDCC 12–62–01, clearly tell us whether the training requirements are completely separate or partially overlapping.

NDCC 1–02–02 guides us:

"Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears, but any words explained in this code are to be understood as thus explained."

Therefore, we hold that the meaning of "peace officer," as explained in NDCC 12–1–01–04(17), applies to chapter 12–62. The training is mandatory for any "public servant authorized ... to enforce the law and to conduct or engage in investigations or prosecutions for violations of law." This definition certainly includes law enforcement officers, other than detectives, without excluding those engaged in jail or detention work.

Of course, whether Moses's' duties made her "a peace officer" was a matter of fact. Ordinarily, we would be bound by the findings of fact of the trial court. *See* NDRCivP 52(a) and *Johnson v. Arithson*, 417 N.W.2d 373 (N.D.1987). But, in this case, the trial court did not interpret relevant statutes nor expressly determine to what extent statutory training require-

ments applied to Moses. Mandatory training for Moses depended on a correct application of the training statutes in the light of her duties; this issue was closely intertwined with the claim of discrimination. We conclude that the trial court's finding on training for Moses may have also been distorted by an erroneous view of the law. Therefore, the breach of contract and due process claims about failure to train Moses are also remanded for a new trial to be resolved by proper application of statutory definitions and proscriptions.

## JURY TRIAL

At first, Moses demanded a jury trial. After amendment of pleadings, she changed her mind and waived a jury. The Sheriff and County declined to waive their right to a jury trial, demanding a jury of nine persons. Moses then moved to strike the case from the jury calendar, arguing that "a right of trial by jury of the causes of action remaining ... does not exist."

The trial court concluded "that the Legislature intended in adopting NDCC 14–02.4–20 that the relief granted to a victim of race or sex discrimination would be equitable and to be determined by the Court without a jury." The trial court acknowledged that the breach of contract claim, "questions of fact relating thereto and the amount of damages, if any, would normally be ascertained by a jury." The trial court reasoned:

"However, in this case, the questions of fact are delicately interwoven with the legal questions of the statute of frauds and the parol evidence rule. Under all the circumstances, the Court is of the opinion that the primary thrust of all three of the Plaintiff's alleged causes of action is equitable and any questions of fact are only incidental and corollary to the clearly equitable nature of the case."

Although the North Dakota Human Rights Act authorizes equitable remedies for unlawful discrimination, NDCC 14–02.-4–20, its remedies are "not limited to" eq-

uitable ones; legal remedies are not excluded.[9]

The right to jury trial for legal claims is secured by the declaration of rights in the North Dakota Constitution, Art. I, § 13. Our rules of civil procedure reiterate that "[t]he right of trial by jury ... shall be preserved to the parties inviolate." NDRCivP 38(a).

Money damages are traditionally legal relief triable by a jury. While money damages incidental to primary equitable relief may not always qualify for a jury trial, except in the trial court's discretion, (*see Lithun v. Grand Forks Public School District No. 1*, 307 N.W.2d 545, 549 (N.D. 1981)), where only legal relief is requested, a trial by jury should be accorded on demand. *General Electric Credit Corp. v. Richman*, 338 N.W.2d 814 (N.D.1983). Although Moses initially sought some injunctive relief, her final amended complaint sought only an award of money damages. Thus, the Sheriff and County were entitled to a jury trial.

Moses insisted her claim for backpay and expenses was analogous to relief under the Federal Civil Rights Act, Title VII, where the award of backpay is generally regarded as discretionary and equitable in nature, triable without a jury, although the United States Supreme Court has not directly so ruled. Sullivan, Zimmen & Richards, Federal Statutory Law of Employment Discrimination, § 9.9(b), p. 577 (1980). This federal analogy is incomplete because the right to jury trial is generally recognized as to legal and backpay claims under other federal discrimination statutes. *See Lorillard v. Pons*, 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Setser v. Novack Inv. Co.*, 638 F.2d 1137, mod. on other grounds, 657 F.2d 962 (8th Cir.1981). Where claims are brought under several federal discrimination statutes, the right to jury trial under one of those statutes supports the demand. *Molthan v. Temple University Comm. System of Higher Education*, 778 F.2d 955, 961 (3rd Cir.1985). It is the nature of each claim made, not the joinder, which is significant. Therefore, we conclude that the federal analogue supports, rather than undercuts, the strong North Dakota tradition according a jury trial on legal claims for money damages.

We reverse and remand for a jury trial in accordance with this opinion.

ERICKSTAD, C.J., and GIERKE, J., concur in the result.

VANDE WALLE, Justice, concurring in part and dissenting in part.

I concur with the result reached by the majority opinion insofar as it reverses and remands for new trial the issue of sex discrimination. I write to express my concern with two facets of that opinion.

First, although there were crude, boorish, and inexcusable racial remarks made by some of Moses's fellow employees and superiors, I believe the record clearly reflects that race did not play a part in the decision to deny her training. I would not expect the plaintiff or her attorneys to concede that the lawsuit was argued on appeal as primarily a case of sex discrimination, but it is apparent to me from the facts adduced at trial that that is the situation. The racial slurs are inflammatory and, while I appreciate the reason for their introduction at the trial court level, it appears to me a superficial conclusion that the trial court determined that the Sheriff

---

9. NDCC 14-02.4-20 says:

"*Relief.* If the court determines that the respondent has engaged in or is engaging in an unlawful practice, the court may enjoin the respondent from engaging in such unlawful practice and order such appropriate relief as will be appropriate which may include, but is not limited to, temporary or permanent injunctions, equitable relief, and back pay limited to no more than two years from the date the complainant has filed a sworn charge with the equal opportunity employment commission or filed the complaint in the state court. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. In any action or proceeding under this chapter the court may grant, in its discretion, the prevailing party a reasonable attorney's fee as part of the costs."

discriminated against Moses on training and transfer because of her race and sex because the trial court found that Moses "clearly proved certain unequal treatment (such as failure to obtain certain peace officer training while other whi[t]e males similarly situated received it)."

It is incredible to construe the decision of the district court as concluding that Moses had agreed to unequal treatment "within the terms of her contract" because she is black. The record is clear that the "agreement" was concerned only with the fact Moses is a woman and the Sheriff needed women for the female detention facility. Unfortunately, "race" and "sex" are used in tandem as if they were an inseparable "buzz word."

Although the racial slurs justified Moses in alleging racial discrimination, I believe the trial illustrated that in this instance the claim of racial discrimination is a red herring which only blurs the real issue of sex discrimination. I would affirm the judgment insofar as it dismissed Moses's suit for race discrimination.

Second, because this is our first opportunity to analyze our Human Rights Act, Chapter 14–02.4, N.D.C.C., I am concerned with the majority's near-total reliance upon Federal case law construing Federal civil rights statutes. It is apparent there are substantial similarities, but if we are to be an echo of the Federal Act there would appear to be little need for our own statutes on the matter. The legislative history of HB 1440 of the 1983 legislative session, which created Chapter 14–02.4, reveals considerable ambivalence as to whether or not our Act was intended to be merely a carbon copy of the already existing Federal statutes or whether it was intended to be tailored to fit North Dakota's particular needs. I suggest we adopt the latter posture.

My uneasiness is focused particularly on that portion of the majority opinion which is concerned with "burden shifting procedures." Footnote 3 indicates that the trial court avoided the issue of applying the burden-shifting procedures as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a Federal Title VII decision, but the majority appears to adopt that procedure when it concludes that the Sheriff and the County "may be able to show a legitimate and nondiscriminatory reason for inhibiting Moses's training and transfer, ..." [1] Although the issue of burden-shifting may not be as acute in this instance, the case having been tried once, consider, as an example, the situation in which a person of a minority race is one of 10 persons applying for a position. In view of this State's homogeneous population that is most probable. Assume further that the person of racial minority, one of 10 applicants, does not receive the position. If I understand the majority opinion and its reliance on *McDonnell Douglas* correctly, the burden shifts to the employer to prove a nondiscriminatory reason for failure to hire minority applicant if the position remains open. Without more, I do not believe we should so blithely import that result into our jurisprudence. If we are to adopt a Federal remedy for racial discrimination, I would suggest we use a test similar to that adopted by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), a case involving not a Federal civil rights statute but rather the evidentiary burden placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges to exclude members of his race from the jury. Justice Powell, speaking for the majority of the Court, determined that to sustain his burden the defendant must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the jury members of the defendant's race; that the defendant is entitled to rely on the fact that peremptory challenges constitute a jury-selection practice that permits those to

---

1. The United States Supreme Court recognized that "the specification ... of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

discriminate who are of a mind to discriminate; and, finally, that the defendant must show that these facts "and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." 476 U.S. at 96, 106 S.Ct. at 1723. The Court further observed that in deciding whether the defendant has made the requisite showing, "the trial court should consider all relevant circumstances. For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* The Court concluded that once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors.

It appears to me that a plaintiff in an action alleging discrimination under our Human Rights Act should be required to show relevant circumstances that at least raise an inference that the defendant denied the minority applicant a position because of the race of that applicant. Without more, I do not believe the mere fact that a minority applicant did not receive the position would raise such an inference. A pattern, if it can be established, of failure to hire qualified minority applicants might, on the other hand, raise such an inference.

While I agree public policy dictates against waiver of an anti-discrimination law as a condition of employment, I would so conclude on the basis of our own jurisprudence, for example, *Krein v. Marian Manor Nursing Home*, 415 N.W.2d 793 (N.D.1987). I am dubious that we should impose on our State the heavy baggage of the nearly countless decisions which have construed the Federal civil rights laws. There may be rationales in those decisions which are applicable to our circumstances. However, where the reason for the Federal rationale does not exist in North Dakota there is no reason we should adopt it indiscriminately.

LEVINE, Justice, concurring and dissenting.

I concur with all of the majority opinion except the reversal of the trial court's denial of a jury trial.

We hold that an employer may not discriminate on the basis of gender or race by refusing to train and transfer a female black employee, despite an agreement condoning the refusal. Moses asserts three claims: that the failure to transfer her was discriminatory; that the failure to train her, when similarly situated white male officers received such training, was discriminatory; and that the refusal to train her was also a breach of contract based upon the statute that requires training for peace officers.

As to the claims of discrimination, NDCC § 14–02.4–20 is controlling and I believe it sets forth in straightforward fashion with clear language that "the court" is to determine whether there is "an unlawful practice," *i.e.*, discrimination, and "the court" is to choose among remedies and order "appropriate relief ... which may include, but is not limited to, temporary or permanent injunctions, equitable relief, and back pay...." While the statute does not limit the relief available to one seeking redress for discrimination, it clearly limits the entity authorized to render that relief.

The legislature has specifically decreed that a claim for relief under ch. 14–02.4 is to be heard and resolved by "the court." A plaintiff is entitled to a jury trial if a jury could have been demanded as a matter of right at common law. *Dobervich v. Central Cass Public School Dist. No. 17*, 283 N.W.2d 187, 190 (N.D.1979). However, there was no action for human rights violations at common law. Nor is there a right to jury trial in a statutory action in the nature of an equitable proceeding. *General Electric Credit Corp. v. Richman*, 338 N.W.2d 814, 817 (N.D.1983). Just as Title VII claims are equitable in nature, *see Olin v. Prudential Ins. Co. of America*, 798 F.2d 1, 7 (1 Cir.1986), so too are claims under NDCC ch. 14–02.4.

Moses' claim for damages based on breach of contract is a legal claim, and generally, legal claims are to be heard by a jury. *See General Electric Corp., supra.* However, when there are both equitable

and legal claims, the plaintiff is entitled to a jury trial on the legal claim, if the legal claim is not merely incidental to the equitable claim. *General Electric Credit Corp., supra* at 818; *Dobervich, supra;* 50 C.J.S., *Juries,* § 25 (1947).

Webster's New World Dictionary defines "incidental" as "1.*a*) happening as a result of or in connection with something more important; *b*) likely to happen as a result or concomitant. 2. secondary or minor, but usually associated." *See also* Black's Law Dictionary where "incidental" is defined as "[d]epending upon or appertaining to something else as primary...." Black's Law Dictionary 686 (5 ed. 1979).

The question is whether Moses' breach of contract claim is (1) connected with but less important than (2) a result of or concomitant with (3) secondary to but associated with her claims of discrimination.

One of the reasons given by the sheriff for not training Moses was that she was hired to be exclusively and presumably eternally, a correctional officer in women's detention and thus she was not a "peace officer" entitled to training. The contract claim for denial of training is thus a result of the discrimination. It certainly is connected with the discrimination. The discrimination claims are more important in the sense that the conduct upon which they are based is also the basis for the breach of contract claim. Similarly, the contract claim is concomitant with the discriminatory refusal to train and transfer and is thus secondary and less important than the claims of discrimination. Therefore, I would hold that the breach of contract to train is incidental to the equitable claims of discrimination and not triable to a jury.

In my view, the legislature has clearly expressed its intention that the court is to hear claims based on discrimination and that the court may order, inter alia, backpay. This is an action for backpay and other money damages and it should be heard by the court, not a jury. The statute does not say that the court or jury is to determine the issues and order relief. Compare NDCC § 14–02.4–20 with NDCC § 32–03–07 (court or jury may award exem-

plary damages). Nor does the statute omit any reference to either court or jury. If it did, we could infer that either court or jury may decide the matter, depending on whether a legal or equitable remedy is sought. Compare with NDCC § 32–03–09 (no reference to either court or jury in measure of damages for breach of contract).

I would hold that there is no right to a jury trial for the claims of discrimination under NDCC § 14–02.4–20 or for the incidental breach of contract claim. I would therefore affirm the trial court's denial of a jury trial. To this extent, I respectfully dissent.

I must add a postscript. I certainly agree with Justice VandeWalle's observation that "where the reason for the Federal rationale does not exist in North Dakota there is no reason we should adopt it indiscriminately." (VandeWalle, J., concurring in part and dissenting in part, p. 6) *See State v. Ringquist*, 433 N.W.2d 207 (N.D. 1988) (Levine, J., dissenting). I add my "amen" to his caveat that we should not treat our state law as an "echo" of the Federal Civil Rights statutes. *Cf. State v. Ringquist, supra* (Levine, J., dissenting).

However, I also believe that we should avoid reinventing the wheel and that where federal law has ironed out some wrinkles, we should take advantage of that experience. Far from importing the baggage of federal law, we are in the enviable position of incorporating the wheat, while rejecting the chaff. The majority has drawn on useful federal analogy in its analysis of our state Human Rights Act. Our act is broader in scope and more generous in the protection it affords than federal civil rights statutes but there are obvious similarities. Federal law is a rich resource which we would be foolish to ignore.

I join in the majority opinion except its resolution of the issue of the right to trial by jury.