KASSAB v MICHIGAN BASIC PROPERTY
INSURANCE ASSOCIATION

Docket No. 90387. Argued March 3, 1992 (Calendar No. 3). Decided
September 30, 1992. Rehearing denied *post,* 1202.

Manual Kassab brought an action in the Wayne Circuit Court
against Michigan Basic Property Insurance Association, the
insurer of his business, and Metropolitan Adjustment & Investi-
gation Company and John D. Honeyman, an attorney, both
hired by Michigan Basic to investigate a claim of fire damage
to the business. Kassab alleged breach of contract, fraudulent
misrepresentation, and discrimination based on national origin
in violation of the Civil Rights Act in denying him coverage.
Thereafter, the complaint was amended, adding a count of
innocent misrepresentation with respect to the insurer and
omitting the charges of fraud and misrepresentation with
respect to Metropolitan Adjustment and Honeyman. The court,
Charles S. Farmer, J., denied the defendants' motions for
summary disposition of the claims of breach of contract, fraud
and misrepresentation, innocent misrepresentation, and dis-
crimination. The Court of Appeals, MURPHY and T. M. BURNS,
JJ. (DANHOF, C.J., concurring in part and dissenting in part),
reversed with regard to the breach of contract claim, affirmed
with regard to the fraud and misrepresentation claim, and
found a cause of action for discrimination under the Civil
Rights Act (Docket No. 112542). The defendants appeal.

In an opinion per curiam, signed by Justices LEVIN, BRICKLEY,
RILEY and GRIFFIN, the Supreme Court *held:*

The judgment of the Court of Appeals regarding the
plaintiff's civil rights claim is reversed; the claim regarding
fraud and misrepresentation is affirmed and remanded to the
circuit court for further proceedings.

1. The gist of the plaintiff's claim is breach of contract.
Because access to insurance coverage was not denied, it is
beyond the legislative purpose to provide a civil rights action

REFERENCES

Am Jur 2d, Civil Rights § 4.
See the Index to Annotations under Contracts; Discrimination;
Insurance and Insurance Companies.

under the public accommodations section of the Civil Rights Act for breach of contract in claims processing. Upon the issuance of a policy of insurance, the services owed by an insurer to an insured are no longer services made available to the public. The rights and obligations of the contracting parties are then private. While an insured is not separated from the public upon entering into insuring agreements embodied in a policy of insurance, the obligations of the insurer are owed to a particular contracting party/insured. The rights and obligations of the contracting parties are specific to the contract and to the persons involved.

2. The plaintiff's complaint stated circumstances constituting fraud with particularity and, thus, stated a cause of action, requiring remand for trial on that claim. Read as a whole, the complaint alleges that false representations were made to the plaintiff before he entered into the contract of insurance with Michigan Basic, and thus that when Michigan Basic entered into the contract of insurance with him and represented that it intended to pay and would pay for fire damage, the representation was false, and that Michigan Basic knew when it made the representation that it was false. The representation is within the so-called bad-faith exception to fraudulent misrepresentation. While the plaintiff may have difficulty in establishing the allegations, they state a cause of action.

Justice LEVIN, writing separately, stated that, read together, the Civil Rights Act and the Uniform Trade Practices Act were not intended to provide a civil rights action for mental distress and anguish with respect to unfair claims processing, alleged to have been based on national origin, and for the payment of attorney fees in addition to the twelve percent interest for delay in payment provided in the UTPA.

While the Unfair Trade Practices Act proscribes civil rights discrimination in refusing to insure, refusing to continue to insure, or limiting the amount for coverage or charging different rates, it does not allude to civil rights discrimination in claims processing. It provides a remedy only for delay in paying contracted-for benefits of twelve percent interest. There is no provision for payment of damages for emotional or mental distress, anguish, or attorney fees.

Affirmed in part, reversed in part and remanded.

Justice MALLETT, dissenting, stated that the trial court appropriately denied the defendants' motion for summary disposition pursuant to MCR 2.116(C)(8) with regard to the fraud and misrepresentation and discrimination claims.

Michigan Basic is a business whose goods and services are

extended, offered, sold, or otherwise made available to the public and, thus, is a place of public accommodation as defined by the Civil Rights Act. The allegations that the defendants engaged discriminatory practices are encompassed by the Civil Rights Act, and thus the defendants' motion for summary disposition was properly denied. The preamble to and §§ 102, 301 and 302 of the Civil Rights Act clearly express the legislative intent to eliminate the effects of offensive or demeaning stereotypes, prejudices, or biases, and guarantee to all citizens equal access to businesses such as the defendants'. Adjustment of claims is a necessary part of the contractual good Michigan Basic is legislatively mandated to offer. Discrimination in any phase of a contractual relationship is unacceptable.

The UTPA prohibits an insurer from refusing to insure because of race, color, creed, marital status, sex, or national origin. While it provides an adequate framework for redress of the plaintiff's complaint, there is no apparent incompatibility between it and the Civil Rights Act. Thus, both are applicable in this case. If the Legislature intended the UTPA to be the exclusive regulatory scheme to address discriminatory practices in the insurance industry, it could have so provided.

General allegations of fraud without averment of specific facts are insufficient to state a cause of action. Fraud must be proved by satisfactory and convincing evidence. A cause of action for fraud or misrepresentation may fail if the alleged representation involves a promise to do a future act, because such a promise is not fraudulent misrepresentation, but is contractual in nature. However, in this case, the plaintiff's allegations comply with recognized bad-faith exception to the future-act rule. Thus, the denial of the defendant's motion for summary disposition was proper.

Chief Justice CAVANAGH, dissenting, stated that although the language of the Civil Rights Act is extremely broad, it is not ambiguous or uncertain as applied to this case. It cannot be disputed that the right to enjoy insurance services free of discrimination, including the right to purchase a policy and to enjoy all the benefits due under it, fall within the scope of the act. It is clear, without the need for further inquiry, that by alleging that Basic evaluated and rejected his claim, not on its merits but on the basis of his national origin, the plaintiff properly stated a legal cause of action under the Civil Rights Act, at least with regard to Michigan Basic, sufficient to survive a motion for summary disposition under MCR 2.116(C)(8).

The plaintiff's discrimination claim rests on a statutory basis separate and distinct from the legal basis of a contractual

claim. The allegation is not that the denial of benefits by the defendants was in violation of the insurance contract or that the insurer intended to defraud the plaintiff at the time the contract was entered into; rather, it is that the act of denying benefits was decisively motivated by animus against the plaintiff because of his national origin. If a breach of contract allegedly motivated by racial or ethnic animus were held to be actionable only as a breach of contract, and not independently as an abhorrent act of invidious discrimination, the unique harm inflicted would be denied, and the very reason for civil rights laws prohibiting such discrimination would be called into question. The fact that a potential contractual claim is suggested by the facts alleged in a given case is irrelevant to the legal viability of a statutory discrimination claim.

The Uniform Trade Practices Act addresses to some extent discrimination in the insurance business, but nothing in the act purports to indicate that it provides the sole or exclusive remedy for discrimination in the insurance industry or that it precludes application of the Civil Rights Act. There is no conflict between the acts. Rather, both statutes apply where discrimination by an insurer is alleged, and they appear to complement each other most effectively. Thus, the Uniform Trade Practices Act does not bar the plaintiff's legal cause of action in this case.

Metropolitan Adjustment and Honeyman are "persons" as defined by § 103(f) of the Civil Rights Act. Section 302 provides that a "person" may not deny an individual the full and equal enjoyment of the services of any business defined as covered by the act. Thus, "person" under § 302 appears to cover any third parties who might interfere with and effectively deny an individual's ability to obtain equal enjoyment of a service offered by a covered business, even if the business itself is innocent of any discriminatory intent, and even if the third parties themselves are not engaged in offering any service to the public. Whether Metropolitan's or Honeyman's alleged discriminatory animus actually caused the ultimate denial of the plaintiff's claim is a factual question, but the allegations against them state a legal cause of action under the Civil Rights Act sufficient to survive a motion under MCR 2.116(C)(8).

Justice BOYLE, dissenting, stated that the first amended complaint does not meet the requirements of MCR 2.112(B)(1) regarding pleading of fraud. Generally, an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud. To fall within the bad-faith

exception, evidence of fraudulent intent must relate to the conduct of an actor at the very time of making a representation or almost immediately thereafter. In the present case, the plaintiff failed to allege any factual evidence to support a bad-faith claim. His complaint merely lists the definition of fraud and misrepresentation. To argue that the complaint stated circumstances constituting fraud with particularity writes MCR 2.112(B)(1) out of the Michigan Court Rules and eliminates the general rule prohibiting fraud actions in future-promise cases except in extremely limited circumstances.

185 Mich App 206; 460 NW2d 300 (1990) affirmed in part and reversed in part.

INSURANCE — CIVIL RIGHTS — CLAIMS PROCESSING — BREACH OF CONTRACT.

A breach by an insurer of contractual obligations in processing a claim by an insured is not within the scope of the Civil Rights Act (MCL 37.2302; MSA 3.548[302]).

*Barr & Associates* (by *Charles J. Barr*) for the plaintiff.

*Dykema Gossett* (by *Donald S. Young* and *Kathleen McCree Lewis*) and *Patterson, Phifer & Phillips, P.C.* (by *Kurt D. Meyer*), for the defendants.

Amici Curiae:

*Zagaroli, Colpean & Venuto, P.C.* (by *Frank R. Venuto*), for Michigan Association of Insurance Companies.

*Monica Farris Linkner* and *Charles P. Burbach* and *Bendure & Thomas* (by *Mark R. Bendure* and *Sidney A. Klingler*) for the Michigan Trial Lawyers Association.

PER CURIAM. The principal question presented is whether Manual A. Kassab may maintain a civil rights action against Michigan Basic Property Insurance Association and others for unfair claims processing following a fire that destroyed business

property insured by Michigan Basic. Another question is whether Kassab's complaint adequately pleaded and stated a cause of action that Michigan Basic made false representations to him that it intended to pay for the fire damage.

I

Kassab was the owner of premises on West Seven Mile Road in Detroit where he conducted business as Seven Mile Auto Electric for a number of years. He purchased a standard fire insurance policy from Michigan Basic with policy limits of $50,000 on the building and $25,000 on contents. The policy was in effect on August 30, 1986, when a fire occurred. He reported the loss and claimed damages in excess of the policy limits. Michigan Basic hired Metropolitan Adjustment & Investigation Company and John D. Honeyman to investigate the claim. On their recommendation, Michigan Basic denied the claim.

More than one year after the claim was denied, Kassab filed a multicount complaint seeking damages against Michigan Basic, Metropolitan Adjustment, and Honeyman. The circuit court denied summary disposition. A divided panel of the Court of Appeals[1] affirmed the denial of summary disposition of the civil rights and fraud and misrepresentation claims, but reversed with respect to the contract claim, holding that it was barred by a one-year statute of limitation.[2]

We reverse the judgment of the Court of Appeals on the civil rights claim, but affirm on the fraud and misrepresentation claim and remand to the circuit court for further proceedings on the fraud and misrepresentation claim.

[1] 185 Mich App 206; 460 NW2d 300 (1990).

[2] MCL 500.2806; MSA 24.12806.

II

Kassab's complaint alleges that Michigan Basic did not pay his fire-loss claim because he is "Chaldean by national origin." Kassab relies on the section of the Civil Rights Act[3] providing that a person shall not "[d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status."[4]

The focus, we agree with Michigan Basic, of that section of the Civil Rights Act is primarily on *denial of access* to a place of public accommodations or public services.[5] Michigan Basic did not deny Kassab access to insurance; it insured Kassab for fire loss.

We do not agree with the dissent that "it would make a mockery of the act's purposes" to recognize that the act might provide a civil rights remedy for refusal to insure, but not a civil rights

---

[3] MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*

[4] MCL 37.2302(a); MSA 3.548(302)(a).

[5] Other provisions of the act preclude an employer (MCL 37.2202; MSA 3.548[202]) from discharging, and a labor organization (MCL 37.2204; MSA 3.548[204]) or educational institution (MCL 37.2402; MSA 3.548[402]) from expelling, an individual. See also MCL 37.2501 *et seq.*; MSA 3.548(501) *et seq.*, barring discrimination in respect to housing.

The cases cited by the dissent concern denials of access to services or goods on the discriminatory basis of the plaintiff's membership in an identified class. *Findling v TP Operating Co,* 139 Mich App 30; 361 NW2d 376 (1984); *Cheeseman v American Multi-Cinema, Inc,* 108 Mich App 428, 431; 310 NW2d 408 (1981) (the plaintiffs had no cause of action for being denied access to the defendants' accommodations on the basis of their youth because of the construction of the "except where permitted by law" language of the public accommodations provision); *Civil Rights Dep't ex rel Forton v Waterford Twp Dep't of Parks & Recreation,* 425 Mich 173; 387 NW2d 821 (1986) (remanded to determine whether the gender classification of an elementary school basketball program survives intermediate level scrutiny).

remedy for discrimination in the "handling and adjustment of claims under a policy."[6]

The dissent's argument assumes that the Legislature intended to provide a civil rights remedy for breach of a commercial contract, and not only a civil rights remedy for refusal to contract. Adoption of the dissent's approach might well result in the addition of a civil rights count in many actions for breach of contract where it has not in the past been commonplace to do so.[7]

III

Acknowledging that an insurer may[8] be a "[p]lace of public accommodation" within the meaning of that term because it is a "business . . . whose . . . services . . . are extended, offered, sold, or otherwise made available to the public,"[9] the gist of Kassab's claim is breach of contract. Because access to insurance coverage was not denied, the majority of the Court is of the

---

[6] CAVANAGH, C.J., *post*, p 464.

[7] The argument also assumes that the Civil Rights Act provides a remedy for refusal to insure, and that the Uniform Trade Practices Act (MCL 500.2001; MSA 24.12001) does not provide the sole remedy for refusal to insure.

We recognize that the remedies provided by the UTPA probably do not include a private cause of action for damages. See *Bell v League Life Ins Co*, 149 Mich App 481; 387 NW2d 154 (1986). See also *Safie, Inc v Nationwide Ins*, 146 Mich App 483; 381 NW2d 747 (1985), and *Barker v Underwriters at Lloyd's, London*, 564 F Supp 352 (ED Mich, 1983).

[8] See *South Dakota Div of Human Rights v Prudential Ins Co*, 273 NW2d 111, 113 (SD, 1978), stating that "solicitation and selling through individual agents dealing with selected groups and selected risks on matters of private contract does not constitute a public accommodation."

Michigan Basic is not an ordinary insurer. It was established pursuant to statute (MCL 500.2920; MSA 24.12920) to provide a source of insurance for persons who otherwise might not be able to obtain insurance. It may be that it does not "solicit" in the usual sense.

[9] MCL 37.2301(a); MSA 3.548(301)(a).

opinion that it is beyond the legislative purpose to provide a civil rights action under the public accommodations section of the act for breach of contract in claims processing. Upon the issuance of a policy of insurance, the services owed by an insurer to an insured are no longer "services . . . made available to the public." The rights and obligations of the contracting parties are then private. While an insured is not separated from the "public" upon entering into insuring agreements embodied in a policy of insurance, the obligations of the insurer are owed to a particular contracting party/insured. The rights and obligations of the contracting parties are specific to the contract and to the persons involved.[10]

No Michigan case is dispositive of the issue. The cases cited by the dissent do not bear directly on the issue whether performance under a contract is within the scope of the civil rights act.[11]

---

[10] Even if Kassab's allegations of discriminatory servicing of the insurance policy are true, Michigan Basic will prevail if the *contract* defense of arson is successfully asserted. To invoke the Civil Rights Act in these circumstances is to broaden the scope of that act beyond its intent to prohibit businesses from discriminatory dealings with the public.

Discriminatory dealings with the public would include such conduct as refusal of access to a public accommodation, *Bolden v Grand Rapids Operating Corp,* 239 Mich 318; 214 NW 241 (1927), or refusal to transact business, *People v Bob-Lo Excursion Co,* 317 Mich 686; 27 NW2d 139 (1947); *Ledsinger v Burmeister,* 114 Mich App 12; 318 NW2d 558 (1982).

[11] The cases cited by the dissent identify the general purpose and construction of the Civil Rights Act. *Miller v C A Muer Corp,* 420 Mich 355, 363; 362 NW2d 650 (1984) (the Michigan Civil Rights Act "seeks to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases"); *Holmes v Haughton Elevator Co,* 75 Mich App 198, 200; 255 NW2d 6 (1977) (the Civil Rights Act is remedial and to be liberally construed).

Cf. *Ledsinger,* n 10 *supra. Ledsinger* is not illustrative of the scope of the public accommodations provisions of the Civil Rights Act. There, an owner of a retail store refused to transact business with the plaintiff because of his race. The Court held that the plaintiff's complaint alleged two violations of the Civil Rights Act: (1) that the defendant ultimately denied the plaintiff the sale of goods because of

Under the most reasonable construction of the scope of the Civil Rights Act, Kassab's claim for breach of contractual obligations in claims processing cannot be maintained.

## IV

We are persuaded that Kassab's complaint stated the circumstances constituting fraud with particularity, that the complaint stated a cause of action, and remand for trial on that claim.[12]

The elements constituting actionable fraud or misrepresentation are well settled:

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. [*Hi-Way Motor Co v Int'l Harvester Co,* 398 Mich 330, 336; 247 NW2d 813 (1976), quoting *Candler v Heigho,* 208 Mich 115, 121; 175 NW 141 (1919).]

Kassab's first amended complaint alleged that he, as the insured, and Michigan Basic, as the insurer, had entered into a contract of fire insurance, that a fire loss occurred which he duly reported to Michigan Basic, that Michigan Basic made representations to Kassab that it intended to pay and would pay for fire damage to his business

the plaintiff's race, and (2) that a statement by the defendant constituted a publication that full and equal enjoyment of the goods sold at the defendant's establishment would be withheld on the basis of race.

[12] In allegations of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity. [MCR 2.112(B)(1).]

property, that the representations were false, that Michigan Basic made the representations knowing they were false or with reckless disregard for their truthfulness, that the representations were made with the intention that Kassab would rely thereon, and that he relied on those representations "*in obtaining* fire protection for his property."

Read as a whole, the complaint alleges that false representations were made to Kassab *before* he entered into the contract of insurance with Michigan Basic, and thus that when Michigan Basic entered into the contract of insurance with Kassab and represented that it intended to pay and would pay for fire damage, the representation was false and Michigan Basic knew when it made the representation that it was false. The allegation that Michigan Basic knew when it made the representation that it was false is within the so-called " 'bad faith' exception to fraudulent misrepresentation" referred to in our colleague's opinion.[13] While Kassab may have difficulty in establishing the allegations, they do state a cause of action.

We reverse the judgment of the Court of Appeals on the civil rights claim, but affirm on the fraud and misrepresentation claim and remand to the circuit court for further proceedings on the fraud and misrepresentation claim.[14]

LEVIN, BRICKLEY, RILEY, and GRIFFIN, JJ., concurred.

LEVIN, J. (*separate opinion*). The essence of Kassab's claim is that Michigan Basic did not process his fire-loss claim in good faith. Kassab asks that this Court recognize a civil rights action against

---

[13] BOYLE, J., *post,* p 489.

[14] This interlocutory appeal has been pending in our state's court system since March, 1988—since November, 1990 in our Court. Thus, we conclude that this matter should not be put over to the October, 1992, term of Court.

insurers for mental distress and anguish[1] resulting from unfair claims processing because of religion, race, color, national origin, age, sex, or marital status.

In the sixteen years since the enactment in 1976 of the Civil Rights Act and the Uniform Trade Practices Act as an amendment to the Insurance Code, insureds claiming unfair claims processing have been confined to the statutory remedy set forth in the UTPA,[2] which provides in general that an insurer must pay twelve percent interest when benefits are not paid on a timely basis.

I have joined in the majority opinion which holds that it is beyond the legislative purpose to provide a civil rights action under the public accommodation section of the act for breach of contract in claims processing. I write separately to explain why I am of the opinion that that is the correct result reading the Civil Rights Act and the Uniform Trade Practices Act together.

A

An earlier effort to recover damages for mental distress and anguish claimed to have been occasioned by unfair claims processing was unsuccessful. In *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401; 295 NW2d 50 (1980), the jury found that the insurer was obliged to pay $16,500 under a disability insurance contract, and additionally awarded $75,000 for mental or emotional distress and $50,000 exemplary damages. This Court, in setting aside the $75,000 and $50,000 awards, said that breach of an "insurance contract, as with

---

[1] See *Boscaglia v Michigan Bell Telephone Co,* 420 Mich 308; 362 NW2d 642 (1984). And, in addition, to provide for payment of attorney fees. MCL 37.2801 and 37.2802; MSA 3.548(801) and 3.548(802).

[2] MCL 500.2006; MSA 24.12006.

almost any agreement, results in some annoyance and vexation," and held that an insurer's failure to pay did not give rise to a right to recover damages for mental distress, mental anguish, or exemplary damages.[3]

## B

The UTPA provides that it constitutes an unfair act or practice in the business of insurance to refuse to insure, to refuse to continue to insure, or to limit the amount of coverage available to an individual because of religion, race, color, national origin, age, sex, or marital status, except that marital status may be used to classify individuals for the purpose of insuring family units, and except, as to age, if there is a reasonable relationship between the age of the individual and the extent of the risk.

The act further proscribes "[c]harging a different rate for the same coverage" on the basis of sex, marital status, or age "unless the rate differential is based on sound actuarial principles, a reasonable classification system, and is related to the actual and credible loss statistics or reasonably anticipated experience in the case of new coverages."[4]

While the UTPA so expressly proscribes civil rights discrimination in refusing to insure, refusing to continue to insure, or limiting the amount of coverage or charging different rates, it does not allude to civil rights discrimination in claims processing.

The only remedy provided by the UTPA for delay in paying contracted-for benefits is recovery of twelve percent interest. There is no provision for

---

[3] *Id.,* pp 417, 419, and 421.
[4] MCL 500.2027(c); MSA 24.12027(c).

payment of damages for emotional or mental distress or anguish or attorney fees.

### C

The parties have called our attention to one case where it was sought to maintain an action against an insurer for violation of a civil rights act. In *Thompson v IDS Life Ins Co,* 274 Or 649; 549 P2d 510 (1976), the Oregon Supreme Court held that its public accommodations act did not cover the sale of insurance and that a female plaintiff could not maintain an action against an insurer under that act for refusal to sell a policy of insurance on the same terms the insurer would sell such a policy to a male.[5] The court observed that the public accommodations act prohibits *all* discrimination, while the insurance laws prohibit only *unfair* discrimination. The court was of the view that it should construe the laws to avoid conflict in their administration.

The dissent states that "whatever conflicts were perceived by the Oregon court to exist in Oregon law plainly do not exist between Michigan's UTPA and Civil Rights Act with regard to this case."[6] The dissent unduly minimizes the potential for conflict. While the UTPA specifically permits discrimination on the basis of sex, marital status, or age in some particulars, there are no exceptions for discrimination on the basis of religion, race, color, or national origin.

Adoption of the view set forth in the dissent

[5] In *South Dakota Div of Human Rights v Prudential Ins Co,* 273 NW2d 111 (SD, 1978), the claim was that the exclusion of benefits to unmarried persons for pregnancy and pregnancy-related disabilities under a group health insurance plan constituted illegal discrimination on the basis of sex.

[6] CAVANAGH, C.J., *post,* p 477, n 18.

would open the door to civil rights actions claiming that the pricing and other policies of insurers discriminate on the basis of religion, race, color or national origin, and also to civil rights actions claiming that pricing and other policies, other than those specifically excepted in the UTPA, discriminate on the basis of age, sex, or marital status.

D

Reading the Civil Rights Act and the Uniform Trade Practices Act together, I am persuaded that the Legislature did not intend to provide a civil rights action for mental distress and anguish with respect to unfair claims processing, alleged to have been based on national origin, and for the payment of attorney fees in addition to the twelve percent interest for delay in payment provided in the UTPA.

MALLETT, J. I respectfully dissent from the majority's opinion in order to express my disagreement with parts II and III. I concur in the result reached by the majority in part IV but write separately because I disagree with the analysis.

I

Relying on the "public accommodation" provisions of the Civil Rights Act, §§ 301 and 302, plaintiff states that defendants Michigan Basic, Metropolitan Adjustment, and Honeyman engaged in discriminatory practices when they reviewed his claim for fire insurance coverage. Particularly, plaintiff contends that defendants deprived him of

the full and equal enjoyment of his fire insurance policy because of his Chaldean national origin.[1]

Section 301 defines "a place of public accommodation" as

> a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. [MCL 37.2301(a); MSA 3.548(301)(a).]

Section 302(a) provides:

> Except where permitted by law, a person shall not:
> Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a); MSA 3.548(302)(a).]

Michigan Basic is dependent upon the broadly based participation of members of the general public. The Court of Appeals correctly found that Michigan Basic is a business whose goods and services are extended, offered, sold, or otherwise made available to the public and, thus, is a place of public accommodation as defined under the Civil Rights Act. 185 Mich App 214.

---

[1] Plaintiff's first amended complaint states:

22. Defendants, their agents, representatives and employees, evaluated and rejected plaintiff's claim not on the merits of the claim but based on plaintiff's national origin, in violation of the Elliott-Larsen Civil Rights Act.
23. Defendants' claimed reasons for rejecting the claim of plaintiff are pretextual.

Finding that Michigan Basic is a place of public accommodation pursuant to § 301 does not resolve the issue of defendants' liability under the Civil Rights Act, however. While plaintiff's allegations that defendants engaged in discriminatory practices may not stand up to scrutiny at trial, I believe the Civil Rights Act encompasses such claims and therefore it is my opinion that defendants' motion for summary disposition pursuant to MCR 2.116(C)(8) was properly denied.

## A

It is generally accepted that legislative intent controls statutory construction. *Owendale-Gagetown School Dist v State Bd of Ed,* 413 Mich 1, 8; 317 NW2d 529 (1982). Legislative intent is commonly gleaned from the actual language used in the statute. *Grand Rapids v Crocker,* 219 Mich 178, 182-183; 189 NW 221 (1922). "If a statute is clear and unambiguous the 'plain meaning rule' applies and precludes judicial interpretation or construction of the statute." *Paaso v Paaso,* 170 Mich App 628, 635; 428 NW2d 724 (1988); see *Owendale, supra.* However, if a statute is ambiguous, a court may properly examine the legislative history of the statute to determine legislative intent. *Luttrell v Dep't of Corrections,* 421 Mich 93; 365 NW2d 74 (1984). In this endeavor, " '[c]ourts do not exist in a vacuum. They may take cognizance of facts and events surrounding the passage and purpose of legislation.' " *Id.* at 103, quoting *Wilkins v Ann Arbor City Clerk,* 385 Mich 670, 691; 189 NW2d 423 (1971).

When there is any doubt about the meaning of statutory language, we have stated that "a court must look to the object of the statute, the harm which it is designed to remedy, and apply a rea-

sonable construction which best accomplishes the statute's purpose." *In re Forfeiture of $5,264,* 432 Mich 242, 248; 439 NW2d 246 (1989). We have also stated that statutory language must be interpreted in light of " 'the subject matter and . . . the general scope of the provision, and . . . in light of the general purpose sought to be accomplished or the evil sought to be remedied by the . . . statute.' " *Altman v Meridian Twp,* 439 Mich 623, 636; 487 NW2d 155 (1992), quoting *White v Ann Arbor,* 406 Mich 554, 562; 281 NW2d 283 (1979).

For the disposition of this case, I suggest that the breadth of the following portion of § 302 is uncertain: "a person shall not . . . [d]eny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation . . . ." The task, therefore, is to determine whether the Legislature intended the activities complained of here to be included in this section of the Civil Rights Act.

Executive Order No. 1985-2 (the Preamble of the Civil Rights Act) provides in part:

Whereas, it has long been the policy of the State of Michigan and this Governor to programmatically insure that Blacks, Hispanics, Asians, Native Americans, Women and Handicappers are given equal participation opportunities in all aspects of American life . . . .

The purposes of the Civil Rights Act as declared by the Legislature are, in relevant part:

[T]o define civil rights; to prohibit discriminatory practices, policies, and customs in the exercise of

those rights based upon religion, race, color, national origin, age, sex, height, weight, or marital status; . . . [and] to provide remedies and penalties . . . . [Preamble to 1976 PA 453.]

The act further expands on its broad remedial purposes by declaring:

The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, or marital status as prohibited by this act, is recognized and declared to be a civil right. [MCL 37.2102(1); MSA 3.548(102)(1).]

These provisions, and §§ 301 and 302, clearly express the Legislature's intent to "eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases," *Miller v C A Muer Corp,* 420 Mich 355, 363; 362 NW2d 650 (1984), and guarantee to all Michigan citizens equal access to businesses that offer goods and services to the public. Moreover, the Civil Rights Act is remedial in nature and must be liberally construed to provide a broad remedy, *Holmes v Haughton Elevator Co,* 75 Mich App 198, 200; 255 NW2d 6 (1977), aff'd 404 Mich 36; 272 NW2d 550 (1978).

Although no Michigan case law is dispositive of the issue raised here, and contrary to the assertions of the majority,[2] *Ledsinger v Burmeister,* 114 Mich App 12; 318 NW2d 558 (1982), is most illustrative of the scope of the public accommodations

---

[2] *Ante,* p 441, n 11.

provisions of the Civil Rights Act.[3] In *Ledsinger,* the plaintiff, an African-American, entered into a contractual agreement with the defendant to buy auto parts from the defendant's place of business. After making a partial payment for the parts, the plaintiff was informed by the defendant that the price of the parts had increased. The defendant then verbally assailed the plaintiff at the defendant's place of business and in the presence of third parties made racially motivated disparaging remarks. The Court of Appeals sustained the plaintiff's claim of violation of the Civil Rights Act and held:

> An inference that might fairly be drawn from plaintiff's allegations is that defendant ultimately denied Mr. Ledsinger the sale of goods because of Ledsinger's race, MCL 37.2302(a); MSA 3.548(302)(a). [*Id.* at 23.]

*Ledsinger* and the cases cited in footnote 3 of this dissent are examples of how the "public accommodations" provisions have been applied. Contrary to the conclusion reached by the Court of Appeals, *Ledsinger* is distinguishable from this case. Here, plaintiff has not alleged that Michigan Basic denied him an opportunity to purchase its goods, in other words, an insurance contract.[4] Neither has plaintiff alleged that Michigan Basic

---

[3] Other Michigan cases that have interpreted § 302(a) include: *Civil Rights Dep't ex rel Forton v Waterford Twp Dep't of Parks & Recreation,* 425 Mich 173; 387 NW2d 821 (1986) (the Court found no discrimination where a township had separate teams for boys and girls in its basketball program); *Findling v TP Operating Co,* 139 Mich App 30; 361 NW2d 376 (1984) (the Court upheld the denial of admission of youths under twenty-one years of age to a business that served alcohol); *Ledsinger v Burmeister, supra; Cheeseman v American Multi-Cinema, Inc,* 108 Mich App 428; 310 NW2d 408 (1981) (a theatre could deny admission to "R" rated movies to minors unaccompanied by a parent or legal guardian).

[4] Plaintiff here has been insured by Michigan Basic since 1978.

denied him access to its facilities or refused to enter into a contract for insurance with him. Such actions are explicitly proscribed under the Civil Rights Act.

Nonetheless, I am persuaded that the act's proscription of denying an individual access to goods and services extended, offered, or sold to the public applies here where plaintiff alleges discrimination in the assessment and servicing of his contract for fire insurance. Subject to the public accommodations provisions, Michigan Basic must offer all members of the public equal opportunities to transact business with the company. Servicing and adjusting insurance claims is a necessary part of the contractual good that Michigan Basic is legislatively mandated to offer. It follows then that to assess an insurance claim in a discriminatory fashion is to deny the insured that good. To prohibit a seller of insurance from discriminating against a member of the public who wishes to purchase insurance, yet offer no protection against a discriminatory assessment of that claim, grants an empty right. Discrimination in any phase of a contractual relationship entered into between an insured and an insurer is unacceptable.

B

The defendants argue that the Legislature intended the Uniform Trade Practices Act, MCL 500.2001 *et seq.*; MSA 24.12001 *et seq.*, to be the *exclusive* regulatory scheme governing unlawful discrimination in the insurance industry.

Relevant portions of the Uniform Trade Practices Act provide:

The purpose of this uniform trade practices act is to regulate trade practices in the business of

insurance in accordance with the intent of congress . . . by defining, or by providing for the determination of . . . all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices, and by prohibiting the trade practices so defined or determined. [MCL 500.2002; MSA 24.12002.]

UTPA, § 2027(a) prohibits an insurer from refusing to insure because of race, color, creed, marital status, sex or national origin. MCL 500.2027(a)(i); MSA 24.12027(a)(i).[5] Moreover, § 2026 specifically addresses inappropriate procedures in the servicing of insurance contracts.

(1) Unfair methods of competition and unfair or deceptive acts or practices in the business of insurance, other than isolated incidents, are a course of conduct indicating a persistent tendency to engage in that type of conduct and include:

(a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue.

(b) *Failing* to acknowledge promptly or *to act reasonably* and promptly *upon communications with respect to claims arising under insurance policies.*

\* \* \*

(d) *Refusing to pay claims without conducting a reasonable investigation based upon the available information.*

\* \* \*

(f) *Failing to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims* in which liability has become reasonably clear. [MCL 500.2026; MSA 24.12026. Emphasis added.]

Under the UTPA, an insurance company is under

---

[5] The UTPA was amended to prohibit discrimination on the basis of race, color, creed, marital status, sex, or natural origin in the same session that the Legislature passed the Civil Rights Act.

the authority of the Commissioner of Insurance and the extensive statutory and regulatory scheme of the Insurance Code of 1956. The UTPA empowers the Insurance Commissioner to examine and investigate allegations of unfair or deceptive acts or practices prohibited by the UTPA. Persons disagreeing with a decision or order of the commissioner may appeal to the circuit court. MCL 500.2041; MSA 24.12041.

Among other things, the commissioner is empowered to issue cease and desist orders, which may include payment of a monetary penalty, suspension or revocation of the person's license, and refund of any overcharges. MCL 500.2040; MSA 24.12040. The UTPA also specifies that every penalty in the code not otherwise provided for shall be sued for and recovered in the name of the people by the county prosecutor, or by the Attorney General. MCL 500.230; MSA 24.1230 with appellate review obtainable in the circuit court. MCL 500.2041; MSA 24.12041.

This Court recognizes that "[a] special statute shall be given effect as an exception to the general statute in order to carry out the legislative intent." *Port Huron Mayor v Port Huron City Treasurer,* 328 Mich 99, 111; 43 NW2d 77 (1950). See also *Grosse Pointe Twp Bd of Ed v Blondell,* 251 Mich 528; 232 NW 375 (1930). When a general intention is expressed, and also a particular intention which is incompatible with the general one, the particular intention shall be considered as an exception to the general one. *Attorney General ex rel Owen v Joyce,* 233 Mich 619; 207 NW 863 (1926); *Reed v Secretary of State,* 327 Mich 108; 41 NW2d 491 (1950).

Although I believe the more specific statute, the UTPA, provides an adequate framework for redress of plaintiff's complaints, there is no statutory

incompatibility between the UTPA and the Civil Rights Act. I would hold that both the UTPA and the Civil Rights Act are applicable here, and that if the Legislature intended the UTPA to be the exclusive regulatory scheme to address discriminatory practices in the insurance industry, it could easily have so provided.

I am mindful that, " 'the intent of the Legislature, when discovered, must prevail [over] any existing rule of construction to the contrary.' " *Metropolitan Council No 23 v Oakland Co Prosecutor,* 409 Mich 299, 318-319; 294 NW2d 578 (1980), quoting *Michigan Central R Co v Michigan,* 148 Mich 151, 156; 111 NW 735 (1907). This Court further explained in *Salas v Clements,* 399 Mich 103, 109; 247 NW2d 889 (1976), that "departure from the literal construction of a statute is justified when such construction would produce an absurd and unjust result and would be clearly inconsistent with the purposes and policies of the act in question." In light of the stated purposes of the Civil Rights Act and our charge to construe civil rights legislation broadly, the result reached in this dissent is neither absurd nor unjust.

Therefore, as to the plaintiff's discrimination claims, I would affirm the Court of Appeals decision upholding the trial court's denial of defendants' motions for summary disposition pursuant to MCR 2.116(C)(8).

II

It is well established in Michigan that general allegations of fraud without averment of specific facts are insufficient to state a cause of action, and the plaintiff must prove the fraud by satisfactory and convincing evidence. *Hi-Way Motor Co v Int'l Harvester Co,* 398 Mich 330, 336; 247 NW2d 813

(1976). The majority duly identifies the elements of fraud that plaintiff must allege in order to state a cause of action. However, a cause of action for fraud or misrepresentation may fail if the alleged representation involves a promise to do a future act. Such a promise does not constitute a fraudulent misrepresentation, but rather is contractual in nature. *Boston Piano & Music Co v Pontiac Clothing Co,* 199 Mich 141, 147; 165 NW 856 (1917). See also *Higgins v Kenneth R Lawrence, DPM, PC,* 107 Mich App 178, 184; 309 NW2d 194 (1981) ("an action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact," "[f]uture promises are contractual and do not constitute fraud"). Failure to perform a promise, moreover, cannot, by itself, constitute evidence of fraud. *Id.* Rather, a claim of fraud must be grounded upon a statement concerning a past or present fact or event that the speaker knows to be false at the time of the statement, or which is made with reckless disregard for its lack of accuracy. *Hi-Way Motor Co, supra* at 336.

This Court recognizes a "bad-faith" exception to the rule that a promise to act in the future does not constitute fraud.[6] If the plaintiff alleges that the speaker had a fraudulent intent at the time of the promise relating to a future activity the fraud claim may be saved. *Hi-Way Motor Co, supra* at 338-339. *Leib v Bostwick,* 256 Mich 277, 280; 239 NW 405 (1931). See also *Connellan v Himelhoch,* 506 F Supp 1290, 1297 (ED Mich, 1981) (the complaining party must establish that the promise was given for the purpose of deceiving the promisee and influencing his conduct).

In the instant case, I believe plaintiff's allega-

---

[6] See *Kovacs v Electronic Data Systems Corp,* 762 F Supp 161 (ED Mich, 1990).

tions comply with the "bad-faith" exception. In count II of his first amended complaint, plaintiff argues that at the time Michigan Basic and he entered into the contract for fire insurance, Michigan Basic represented that it would pay on the contract, having no intention of doing so.[7] Assuming arguendo that plaintiff could prove Michigan Basic's fraudulent intent, and accepting as true plaintiff's factual allegations, as must be done when considering to grant a motion for summary disposition pursuant to MCR 2.116(C)(8), plaintiff's fraud and misrepresentation claim is valid.

Accordingly, I concur in the majority's decision to remand plaintiff's fraud and misrepresentation claims for further proceedings.

CAVANAGH, C.J. (*dissenting*).

### I. INTRODUCTION

The majority concludes that the plaintiff in this

---

[7] Plaintiff's first amended complaint provides, among other things:

10. Defendant Michigan Basic made representations to plaintiff that it intended to pay and would pay for fire damage to his business property at 912 W. Seven Mile in Detroit.

11. Defendant's representations were false.

12. Defendant made the representations knowing they were false or with reckless disregard for their truthfulness.

13. Defendant made the representations with the intention that plaintiff rely upon them.

14. Plaintiff relied upon the false representations of defendant in obtaining fire protection for his property.

15. As a direct and proximate result of defendant's false representations and plaintiff's reliance . . . plaintiff suffered the injuries and damages . . . .

\* \* \*

17. Defendant represented to plaintiff that it intended to pay and would pay for fire damage to plaintiff's business property, which representations were false.

18. Plaintiff believed defendant's representations and was deceived by them.

case has failed to state a legally cognizable cause of action under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.,* with regard to his claim of discrimination on the basis of national origin in the handling and denial of his fire insurance claim. I cannot agree.

The grant order in this case was unlimited,[1] and the defendants specifically raised, briefed, and argued before this Court the claim that the trial court should have granted summary disposition in their favor on the plaintiff's Civil Rights Act claim pursuant to both MCR 2.116(C)(8) *and* MCR 2.116(C)(10). The trial court has refused thus far to grant the motion under MCR 2.116(C)(10), which tests the factual support for a claim, because, at the time the defendants chose to pursue this interlocutory appeal and thereby interrupt proceedings in the trial court, discovery had apparently not yet been completed to the trial court's satisfaction. I would affirm the Court of Appeals refusal to disturb that discretionary judgment of the trial court. See 185 Mich App 206, 216-217; 460 NW2d 300 (1990). Summary disposition under MCR 2.116(C)(10) would, of course, remain an appropriate possibility following further proceedings and discovery on remand. See also n 22.[2]

The central and most important issues in this case, however, are presented before us *not* pursuant to MCR 2.116(C)(10), but rather as pure questions of law pursuant to MCR 2.116(C)(8). Under that rule, of course, it is well established that the truth of all factual allegations is assumed and a court is limited to determining whether the complaint, on its face, states a cognizable cause of

---

[1] 439 Mich 867 (1991).

[2] Aside from summary disposition pursuant to MCR 2.116(C)(10), a remedy for factually frivolous claims also exists in the form of sanctions pursuant to MCR 2.114(E).

action as a matter of law. See, e.g., *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567, 647; 363 NW2d 641 (1984).[3] Thus, any perceptions members of this Court may have regarding the factual merits, or lack thereof, of this particular claim by this particular plaintiff, have no proper place whatsoever in our analysis of these issues.

The single most important question presented by this case, a pure legal issue of profound significance, is whether the Civil Rights Act covers the type of discrimination alleged in this case: that is, the alleged refusal of an insurance company and its agents to honor or comply with the terms of an insurance policy on the basis of the policyholder's national origin. This question, of course, actually incorporates several distinct subissues, including those relating to the text of the statute, the legislative purpose, the relevance of the Uniform Trade Practices Act (UTPA), MCL 500.2001 *et seq.*; MSA 24.12001 *et seq.,* and the application of the Civil Rights Act to "third party" defendants such as Metropolitan and Honeyman in addition to the lead defendant, Basic. I set forth my views on each of these issues below.[4]

## II. THE STATUTORY TEXT

It is axiomatic that the starting point in resolving any statutory interpretation issue is the text of the statute itself. This Court has held that where the statutory language is unambiguous, further judicial inquiry is neither necessary nor permissible. See, e.g., *In re Forfeiture of $5,264,* 432 Mich 242, 248; 439 NW2d 246 (1989); *Achtenberg v East*

---

[3] The cited passage in *Ross* refers to GCR 1963, 117.2(1), the predecessor of MCR 2.116(C)(8).

[4] I agree with the majority's resolution of the issue regarding the plaintiff's fraudulent misrepresentation claim. See *ante,* pp 442-443.

*Lansing,* 421 Mich 765, 770; 364 NW2d 277 (1985) ("[w]hen the language of a statute is clear, courts *must* apply it as written") (emphasis added); *Browder v Int'l Fidelity Ins Co,* 413 Mich 603, 611; 321 NW2d 668 (1982) ("where the Legislature uses certain and unambiguous language, the plain meaning of the statute *must* be followed") (emphasis added). As my Brother GRIFFIN has so recently and forcefully noted, "[w]hen the language of a statute is certain, clear, and unambiguous, it is to be applied as written." *Priesman v Meridian Mutual Ins Co,* 441 Mich 60, 72; 490 NW2d 314 (1992) (GRIFFIN, J., dissenting), citing *Achtenberg* and *Browder, supra.* "While our task is to discern and give effect to legislative intent, where the statute is unambiguous this intent is to be gleaned from the language of the statute itself." *Id.,* pp 72-73, citing *Storey v Meijer, Inc,* 431 Mich 368, 376; 429 NW2d 169 (1988).

I disagree at the outset with the majority's apparent premise that the language of the Civil Rights Act is ambiguous or uncertain as applied to this case. Of course, the language of the act *is* extremely broad, and no doubt uncertainties *could* arise regarding its application to many hypothetical cases, as would be the case with almost any statutory language. But breadth of coverage is not the same as ambiguity; a statute can be sweeping without being vague. The issue is whether there is any ambiguity or uncertainty in the application of the statutory language *to the case at hand.* In my view, the very breadth of the act's language indicates unambiguously that it sweeps within its scope the alleged discrimination in this case.

With regard to discrimination in public accommodations, the act contains a central operative section and several relevant definitional sections. The operative section states, in relevant part:

Except where permitted by law, a person shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302; MSA 3.548(302).]

The reference to a place of "public service" is not relevant here, because the act defines a "[p]ublic service" to mean only a governmental agency or "a tax exempt private agency established to provide service to the public." MCL 37.2301(b); MSA 3.548(301)(b).

The act defines a "[p]lace of public accommodation," however, as follows:

"Place of public accommodation" means *a business,* or an educational, refreshment, entertainment, recreation, health, or transportation facility, *or institution of any kind, whether licensed or not,* whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. [MCL 37.2301(a); MSA 3.548(301)(a). Emphasis added.]

The act also states:

"Person" means *an individual, agent,* association, *corporation,* joint apprenticeship committee, joint stock company, labor organization, *legal representative,* mutual company, partnership, receiver, trust, trustee in bankruptcy, unincorporated organization, the state or a political subdivision of the state or an agency of the state, *or any other legal or commercial entity.* [MCL 37.2103(f); MSA 3.548(103)(f). Emphasis added.]

It would be more tedious than difficult to at-

tempt to identify all the types of businesses that are covered by this sweeping and virtually all-inclusive language. It is far more difficult, I submit, to identify those businesses, if any, that fall outside its scope. It cannot be seriously disputed, in my view, that insurance services, including the right to purchase a policy *and to enjoy all the benefits due under the policy,* fall within the scope of this language. An insurance company like Basic is obviously a form of "business," and there is no dispute that Basic generally offers its services to the public. Likewise, it cannot reasonably be denied that the opportunity to purchase a policy and to enjoy all the contractual benefits due under the policy fall within the scope of the "services, . . . privileges, [or] advantages" provided by an insurance company.[5]

The defendants argue, however, and the majority agrees, that even if the Civil Rights Act applied

[5] The defendants' argument that the insurance business is not covered by the act because it does not specifically refer to "insurance," while dealing separately with discrimination in employment, education, and housing, is specious and unpersuasive. Section 301 obviously moves away from the "laundry list" approach of Michigan's historic public accommodations law, MCL 750.146-750.147; MSA 28.343-28.344, by employing terms of sweeping and general application. Section 301 does not specifically refer to "automobile repair shops," "accounting firms," "popsicle stands," or innumerable other specific types of business either, and yet they, like insurance services, would clearly fall within § 301's sweeping references to a "business . . . or institution *of any kind,* whether licensed or not . . . ." (Emphasis added.)

That the Legislature chose, in the Civil Rights Act, to deal separately and comprehensively with the problems of discrimination in employment, education, and housing, see §§ 202, 402, and 502, is neither surprising nor relevant to the proper interpretation and scope of the public accommodations sections. Just as §§ 301 and 302 built upon the foundation of Michigan's historic public accommodations law first enacted by 1885 PA 130, so the employment and housing provisions of the Civil Rights Act were rooted in previous statutes addressing those areas. See Fair Employment Practices Act, 1955 PA 251, compiled at 1948 CL 423.301 *et seq.* (Mason's Supp, 1961), and 1970 CL 423.301 *et seq.*; Fair Housing Act, 1968 PA 112, compiled at 1970 CL 564.101 *et seq.*

to the sale of insurance policies, it would not apply to the handling and adjustment of claims under a policy. Rather, the defendants argue, and the majority agrees, that § 302 covers only denial of a customer's "access" to business services. *Ante,* p 439. This interpretation finds no support in, and indeed contradicts, the language of § 302, which refers to "the *full* and equal *enjoyment,*" not just of a business' "facilities" and "accommodations," but also of its "services," "privileges," and "advantages." See also part III, n 9, and part IV, n 11. In any event, the majority's argument that "Basic did not deny Kassab *access* to insurance," *ante,* p 439 (emphasis added), is true only in the most facile and hairsplitting sense. Obviously, according to the plaintiff's allegations, he *was* denied *nondiscriminatory* "access" to *the full range of insurance services* provided by Basic.

The majority's narrow focus on "access" not only does violence to the plain language of the Civil Rights Act, it makes a mockery of the act's purposes. See, generally, part III; see also part IV (discussing the majority's contractual remedy preclusion theory). An insurance policy is not worth much if benefits cannot be collected under it when warranted. An insurance company, by definition, makes money every time it sells a policy, and loses money every time benefits are paid. How convenient, then, for a discriminatory insurance company, if the Civil Rights Act requires only that it accept premium payments from the victims of its discrimination, and not that it also pay out benefits when warranted! Such victims would be rendered worse off than if the insurance company had discriminatorily refused to sell them insurance in the first place![6]

---

[6] Even if there were any textual support for this interpretation,

It is thus clear, without the need for any further inquiry, that this plaintiff, by alleging in his complaint that Basic "evaluated and rejected [his] claim not on the merits of the claim but based on [his] national origin," has properly stated a legal cause of action under the Civil Rights Act (at least with regard to Basic), sufficient to survive a motion under MCR 2.116(C)(8).[7]

### III. THE LEGISLATIVE PURPOSE

Assuming arguendo that there is any relevant ambiguity in the Civil Rights Act as applied to this case, my conclusion would not change. Reference to the Legislature's expressed purposes, and to well-established principles of statutory construction, leaves no doubt that the act must be con-

which there is not, well established principles of statutory construction would weigh heavily and decisively against adopting it. As this Court has held, " 'statutes should be construed to prevent absurdity, hardship, injustice or prejudice to the public interest.' " *Altman v Meridian Twp,* 439 Mich 623, 635; 487 NW2d 155 (1992), quoting *Franges v General Motors Corp,* 404 Mich 590, 612; 274 NW2d 392 (1979). See generally part III.

[7] I believe the Court of Appeals correctly identified *Ledsinger v Burmeister,* 114 Mich App 12; 318 NW2d 558 (1982), as a very powerful authority supporting the legal viability of the plaintiff's discrimination claim. 185 Mich App 215. *Ledsinger* strongly supports my conclusion in this case, and does not, contrary to the majority's suggestion, involve merely "denial[ ] of access to services or goods . . . ." *Ante,* p 439, n 5; see also *id.,* p 441, n 11. In *Ledsinger,* just as in this case, the key allegation was not that the defendant categorically refused to do business with the plaintiff, but rather that the defendant, having entered into a contract with the plaintiff, refused to fulfill the terms of the contract for discriminatory reasons. See 114 Mich App 23 (holding that the alleged discriminatory refusal to fulfill the sales contract, and the alleged racial epithets indicating that minority customers were unwelcome at the defendant's store, stated *two separate causes of action* under § 302 of the Civil Rights Act). What the plaintiff in *Ledsinger* was allegedly denied (leaving aside the alleged racial epithets, which raised an additional and separate issue) was the opportunity to purchase certain goods *at the price agreed upon in the contract.* This is fundamentally analogous to the plaintiff's claim in this case that he was discriminatorily denied the opportunity to obtain benefits allegedly due under his insurance contract.

strued to cover the kind of discrimination alleged in this case.[8]

When there is any doubt about the meaning of statutory language, we have stated that "a court must look to the object of the statute, the harm which it is designed to remedy, and apply a reasonable construction which best accomplishes the statute's purpose." *In re Forfeiture of $5,264,* 432 Mich 248. We have also stated that statutory language must be interpreted in light of " 'the subject matter and . . . the general scope of the provision, and . . . in light of the general purpose sought to be accomplished or the evil sought to be remedied by the . . . statute.' " *Altman v Meridian Twp,* 439 Mich 623, 636; 487 NW2d 155 (1992), quoting *White v Ann Arbor,* 406 Mich 554, 562; 281 NW2d 283 (1979).

The purposes of the Civil Rights Act as declared by the Legislature are, in relevant part:

> [T]o define civil rights; to prohibit discriminatory practices, policies, and customs in the exercise of those rights based upon religion, race, color, national origin, age, sex, height, weight, or marital status; . . . [and] to provide remedies and penalties . . . . [Preamble to 1976 PA 453.]

The act further expands on its broad remedial purposes by declaring:

> The opportunity to obtain employment, housing and other real estate, and the full and equal utilization of public accommodations, public service, and educational facilities without discrimination because of religion, race, color, national origin, age, sex, height, weight, or marital status as

---

[8] I would exclude from the sweep of this statement the issue regarding coverage of Metropolitan and Honeyman, discussed in part VI, which, I would concede, presents a closer and more genuinely difficult question.

prohibited by this act, is recognized and declared to be a civil right. [MCL 37.2102(1); MSA 3.548(102)(1).]

It is well established that a broad remedial statute of this nature should be "liberally construed to suppress the evil and advance the remedy." *Eide v Kelsey-Hayes Co,* 431 Mich 26, 34; 427 NW2d 488 (1988). We have consistently rejected, as in *Eide,* unnecessarily restrictive interpretations of the Civil Rights Act. See *id.* at 33. The principle that this Court should construe Michigan's civil rights laws broadly and liberally did not, of course, originate in *Eide.* In fact, that approach has (until now) prevailed for more than a century. See *Ferguson v Gies,* 82 Mich 358, 365; 46 NW 718 (1890) (inferring a private, civil cause of action to enforce Michigan's historic public accommodations law, 1885 PA 130, now codified at MCL 750.146-750.147; MSA 28.343-28.344, which at that time provided expressly only for criminal prosecution).

*Ferguson* is one of the truly great and historic decisions of this Court. Decided six years before a more famous (and more notorious) *"Ferguson"* case, see *Plessy v Ferguson,* 163 US 537; 16 S Ct 1138; 41 L Ed 256 (1896), this Court's unanimous *Ferguson* decision condemned and rejected, in remarkably passionate terms, the theory of "separate but equal" adopted six years later by the United States Supreme Court, declaring:

> Any discrimination founded upon the race or color of the citizen is unjust and cruel, and can have no sanction in the law of this State. [82 Mich 365; see, generally, *id.* at 363-368.]

Thus, in both a substantive sense (regarding the rejection of the "separate but equal" theory) and a

procedural sense (regarding the inference of a private civil remedy), this Court's decision in *Ferguson* represents the original and enduring example of our traditionally broad and generous construction of Michigan's civil rights laws, an interpretive approach and spirit that I believe this Court should continue to follow.

I think it self-evident, given the above-described legislative purposes and principles of statutory construction, that any interpretation along the lines suggested by the defendants in this case should be heavily disfavored, and should bear an exceptionally heavy burden of persuasion. For the reasons stated in part II, I think it self-evident that that burden has not been met.[9] Regrettably, the majority decides otherwise, and, without any satisfactory explanation or justification, chooses to abruptly depart from the tradition exemplified by our decisions, nearly a century apart, in *Ferguson* and *Eide.*

---

[9] The defendants argue that the alleged discrimination would not be covered by Michigan's historic public accommodations law, MCL 750.146-750.147; MSA 28.343-28.344, and that the Legislature did not intend the public accommodations provision of the Civil Rights Act to have any greater scope. The premise of this argument is highly dubious, and the conclusion runs counter to logic and violates a well-established principle of statutory construction. It is true, of course, that the public accommodations provision of the Civil Rights Act was patterned after the earlier law. But the fact that the Legislature chose to retain the older law, while enacting a new statute explicitly phrased in far broader and more sweeping terms, would seem to be a strong indication that a broader and more sweeping meaning was intended. To arbitrarily equate the two laws would render the Civil Rights Act a nullity in that respect. That would "violate[ ] . . . the familiar principle of statutory construction that '[e]very word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible.'" *Altman,* 439 Mich 635, quoting *Baker v General Motors Corp,* 409 Mich 639, 665; 297 NW2d 387 (1980).

Furthermore, it is doubtful whether the scope of the older law itself could be limited in the manner suggested by the defendants to cover only "access" in a physical or spatial sense. See, e.g., *Welsh v Boy Scouts of America,* 742 F Supp 1413, 1418-1421 (ND Ill, 1990) (interpreting the even more narrowly worded public accommodations provision of title II of the federal Civil Rights Act, 42 USC 2000a).

IV. THE CONTRACTUAL REMEDY PRECLUSION THEORY

The key to the majority's analysis is its theory that merely because the facts alleged in this case suggest a potential contractual claim, the plaintiff's statutory discrimination claim should therefore be precluded. See *ante,* pp 440-442. The plaintiff's contractual claim, however, is not before this Court,[10] and the existence of a potential contractual claim is totally irrelevant to the existence or viability of a statutory discrimination claim.

The plaintiff's discrimination claim rests on a statutory basis separate and distinct from the legal basis of a contractual claim, just as both the contractual and the discrimination claims are, in turn, distinct from, and rest on separate legal bases from, the fraudulent misrepresentation claim. All three claims arise from the same alleged underlying facts, but each proceeds under a different legal theory and alleges a qualitatively different type of legal harm. The basis of the discrimination claim is not that Basic denied benefits in violation of the insurance contract, or that Basic intended to defraud the plaintiff at the time the contract was entered into, but rather that Basic's action in denying benefits was decisively motivated by animus against the plaintiff on the ground of his national origin.

In both a real and a legal sense, the harm resulting from racially or ethnically discriminatory treatment is different in kind from, and far more socially costly and morally offensive than,

[10] The plaintiff, of course, did raise a contractual claim in his complaint, but the Court of Appeals held that it was time-barred because the complaint was filed after the applicable one-year statute of limitations had run. 185 Mich App 210-212. The plaintiff did not cross-appeal that issue to this Court.

the harm resulting from a mere breach of the terms of a business contract. If, as the majority holds, an alleged breach of contract allegedly motivated by racial or ethnic animus is generally actionable *only* as a breach of contract, and not *also, independently,* as an act of invidious discrimination, then the unique harm inflicted by such discrimination is denied, and the very raison d'être of civil rights laws prohibiting such discrimination is called into question.[11]

The United States Supreme Court has spoken clearly to this fundamental distinction between a contractual claim and a statutory discrimination claim, *even where both claims arise from the same underlying facts.* In *Alexander v Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974), it held that an employment discrimination claim under title VII of the Civil Rights Act, 42 USC 2000e *et seq.,* is not foreclosed by the prior

[11] For textual support for its contractual remedy preclusion theory, the majority asserts that "[u]pon the issuance of a policy of insurance, the services owed by an insurer to an insured are no longer 'services . . . made available to the public' " within the meaning of MCL 37.2301(a); MSA 3.548(301)(a). *Ante,* p 441. How the standard duties and services agreed to in an insurance policy are not "made available to the public," when the insurance policy *itself,* as in this case, *indisputably is* "made available to the public," is difficult to comprehend.

The fact that in a contractual relationship, "[t]he rights and obligations of the contracting parties are . . . private," or that "[t]he obligations of the insurer are owed to a particular contracting party/insured," *ante,* p 441, does not in any way support excluding discrimination in that context from the scope of the Civil Rights Act. The act is not limited to protecting the "public" as a vague generality, nor can it be plausibly maintained that an individual member of the "public" loses protection under the act as soon as his dealings with a covered business take on an individualized or contractual form. The language, "services . . . made available to the public," does not even appear in § 302(a), the relevant operative provision of the act, but rather in § 301(a)'s definition of the types of business entities covered by the act. The *individualized* focus of the act is explicit on its face: once it is established that a business is covered under § 301(a), § 302(a) provides that no *"person"* shall deny to any *"individual* the *full* and equal *enjoyment* of the goods, *services,* facilities, privileges, advantages, or accommodations" of that business. (Emphasis added.)

submission of a grievance to final arbitration pursuant to a collective bargaining agreement's non-discrimination clause. The Court stated, in relevant part:

> In submitting his grievance to arbitration, an employee seeks to vindicate his *contractual right* under a collective-bargaining agreement. By contrast, in filing a lawsuit under title VII, an employee asserts *independent statutory rights* accorded by Congress. *The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence.* And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.
>
> * * *
>
> Moreover, a *contractual right* to submit a claim to arbitration is not displaced simply because Congress also has provided a *statutory right against discrimination. Both rights have legally independent origins and are equally available to the aggrieved employee.* . . . Thus the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by title VII. [415 US 49-50, 52, 53-54 (emphasis added); see also *Gilmer v Interstate/Johnson Lane Corp,* 500 US —; 111 S Ct 1647; 114 L Ed 2d 26, 42-43 (1991) (quoting the first part of this passage and reaffirming the distinction between contractual and statutory rights).][12]

---

12 I have found a number of cases that have involved both discrimination and contractual claims arising from the same facts, and none of those cases has even suggested that the potential availability of the contractual claim in any way impaired, or had any effect whatsoever upon, the discrimination claim. Contrary to the majority's assertion, these cases, like the *Alexander* case quoted above, *do* "bear directly on the issue whether performance under a contract is within the scope of" most federal and state civil rights laws. See *ante,* p 441.

The majority's reasoning in this case with regard to its contractual remedy preclusion theory bears more than a passing resemblance to the widely criticized five-to-four decision of the United States Supreme Court in *Patterson v McLean Credit Union,* 491 US 164; 109 S Ct 2363; 105 L Ed 2d 132 (1989), wherein the majority adopted a highly cramped and restrictive interpretation of a federal civil rights law, 42 USC 1981, in order to reject the legal viability of a black woman's claim regarding racial harassment on the job. Similarly to the majority's approach in this case, the *Patterson* majority drew a preciously fine distinction between the right to be free of discrimination with regard to, on the one hand, entering into a contract in the first place and, on the other hand, receiving benefits under the contract when due. See 491 US 177. This reasoning was harshly criticized at the time, see, e.g., 491 US 207-219 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting), and Congress soon overruled *Patterson* by amending 42 USC 1981 to clarify that it did, in fact, cover not merely the "making" of contracts, but "the enjoyment of all benefits,

See, e.g., in Michigan Courts, *Pompey v General Motors Corp,* 385 Mich 537; 189 NW2d 243 (1971), and *Ferrell v Vic Tanny Int'l, Inc,* 137 Mich App 238; 357 NW2d 669 (1984); in the federal courts, *Watson v Fraternal Order of Eagles,* 915 F2d 235 (CA 6, 1990), *O'Diah v Univ of California,* 1991 US Dist LEXIS 13468 (ND Cal, September 19, 1991) (claims for, inter alia, denial of benefits under a health insurance policy and discrimination on the grounds of national origin), *Jones v Boston,* 738 F Supp 604 (D Mass, 1990), *Zewde v Elgin Community College,* 601 F Supp 1237 (ND Ill, 1984), *Brown v Loudoun Golf & Country Club, Inc,* 573 F Supp 399 (ED Va, 1983), *Kane v New York City,* 468 F Supp 586 (SD NY, 1979), aff'd without opinion 614 F2d 1288 (CA 2, 1979), and *McLeod v College of Artesia,* 312 F Supp 498 (D NM, 1970); and in the courts of other states, *Miller v Spicer,* 602 A2d 65 (Del, 1991), *Weller v Spring Creek Resort, Inc,* 477 NW2d 839 (SD, 1991), *Moses v Burleigh Co,* 438 NW2d 186 (ND, 1989), *Lloyd Lions Club of Portland v Int'l Ass'n of Lions Clubs,* 81 Or App 151; 724 P2d 887 (1986), app dis 303 Or 698; 740 P2d 182 (1987), and *Bush v Greyhound Lines, Inc,* 62 Or App 735; 662 P2d 25 (1983), rev'd on other grounds 295 Or 619; 669 P2d 324 (1983).

privileges, terms, and conditions of the contractual relationship." 42 USC 1981(b), as amended by the Civil Rights Act of 1991, PL 102-166, § 101; 105 Stat 1071.

Section 302 of Michigan's Civil Rights Act, unlike 42 USC 1981 (either before or after the 1991 amendment), is not, of course, limited to contractual relationships. Rather, the far more sweeping language of § 302 covers the full range of "goods, services, facilities, privileges, advantages, or accommodations" provided by a covered business, language plainly encompassing *contractual* "privileges." See n 11.

In sum, the fact that a potential contractual claim is suggested by the facts alleged in a given case is irrelevant to the legal viability of a discrimination claim under the Civil Rights Act. The majority's contrary holding threatens to seriously erode the protective scope of our civil rights laws.[13]

### V. THE UNIFORM TRADE PRACTICES ACT

The most serious argument in support of excluding the alleged discrimination from the scope of the Civil Rights Act is the fact that discrimination

---

[13] *Kewin v Massachusetts Mutual Life Ins Co,* 409 Mich 401; 295 NW2d 50 (1980), upon which the concurrence relies, see LEVIN, J., *ante,* p 444, has no relevance to this case. This Court stated in *Kewin:*

We hold that, *absent allegation and proof of tortious conduct existing independent of the breach,* . . . exemplary damages may not be awarded in common-law actions brought for breach of a commercial contract. [*Id.* at 420-421. Emphasis added.]

The Court noted that the plaintiff in *Kewin* had "neither pleaded nor proved" any such independent tortious conduct. *Id.* at 421. In this case, obviously, the plaintiff *has* alleged statutorily defined "tortious conduct" (namely, discrimination) above and beyond the mere breach of a commercial contract.

Neither I nor any other member of this Court reach the issue of the appropriate type of relief in this type of case. That issue would generally be governed by MCL 37.2801; MSA 3.548(801).

in the insurance business is also addressed, to some extent, by the Uniform Trade Practices Act, MCL 500.2001 *et seq.*; MSA 24.12001 *et seq.,* which constitutes chapter 20 of the Insurance Code. Even this argument, however, evaporates under careful scrutiny.

In 1976, several months before the enactment of the Civil Rights Act, the Legislature added § 2027 to the UTPA, which provides, inter alia:

Unfair methods of competition and unfair or deceptive acts or practices in the business of insurance include:

(a) Refusing to insure, or refusing to continue to insure, or limiting the amount of coverage available to an individual or risk because of any of the following:

(i) Race, color, creed, marital status, sex, or national origin, except that marital status may be used to classify individuals or risks for the purpose of insuring family units.[14]

The defendants cite the Court of Appeals decision in *Bell v League Life Ins Co,* 149 Mich App 481; 387 NW2d 154 (1986), which held that there is no private cause of action to enforce the UTPA. *Bell,* however, is irrelevant to this case. The Civil Rights Act expressly affords a victim of alleged discrimination the right to "bring a civil action for appropriate injunctive relief or damages, or both." MCL 37.2801(1); MSA 3.548(801)(1). This case, obviously, was brought under the Civil Rights Act, not the UTPA.

Furthermore, while I express no firm view on the issue, *Bell* may not have been correctly de-

---

[14] Section 2082 of the UTPA, originally enacted nearly a century ago as 1893 PA 59 and essentially unchanged since that time, specifically prohibits "discrimination between white persons and colored persons, wholly or partially of African descent," with regard to any aspect of life insurance.

cided. While the UTPA apparently contains no *express* provision for any private cause of action, the lack of such an express provision has not prevented this Court in the past from *inferring* a private cause of action to enforce an antidiscrimination statute. Indeed, such an approach has been an historic and long-established practice of this Court. See, e.g., *Ferguson v Gies, supra* (discussed in part III); *St John v General Motors Corp,* 308 Mich 333, 336; 13 NW2d 840 (1944) (inferring a private, civil cause of action to enforce a statute prohibiting sex discrimination with regard to wages, which at that time provided expressly only for criminal prosecution); see also *Pompey v General Motors Corp,* 385 Mich 537, 552-553; 189 NW2d 243 (1971).[15]

The UTPA expressly authorizes the Commissioner of Insurance to investigate allegations of conduct in violation of the statute, issue complaints in that regard, hold hearings, issue cease and desist orders, and impose various other administrative penalties, including license revocation. See UTPA, §§ 2028-2040.[16] The Civil Rights Act, of course, contains its own administrative enforcement mechanism, which, among other things, authorizes the Civil Rights Department to "[r]eceive, initiate,

[15] I emphasize that because this case does not arise directly under the UTPA, I do not reach any firm conclusions in this regard. The existence of a private cause of action to enforce the UTPA is not an issue directly raised in this case, and I do not purport to decide or prejudge it.

[16] The commissioner is the responsible state licensing authority with regard to the insurance business. See MCL 500.402 *et seq.*; MSA 24.1402 *et seq.* The UTPA provides that orders and decisions of the commissioner may be appealed to circuit court, and ultimately to this Court. See § 2041; see also MCL 500.244; MSA 24.1244. The Insurance Commissioner's authority under UTPA, §§ 2028-2040, applies only to the requirements of §§ 2001-2050, thus excluding the antidiscrimination provision in § 2082. See n 14. Section 2082(2) provides independently for criminal prosecutions for violations and for civil enforcement actions by the Attorney General.

investigate, conciliate, adjust, dispose of, issue charges, and hold hearings on complaints alleging a violation of [the] act," MCL 37.2602(c); MSA 3.548(602)(c), and to seek temporary restraining orders, § 603, and which authorizes the Civil Rights Commission to issue final orders "after a hearing on a charge issued by the department," § 605(1), together with a wide variety of appropriate relief, § 605(2)-(4).

The dispositive question is whether there is any conflict between the UTPA and the Civil Rights Act relevant to this case. Clearly there is not. Nothing in the UTPA purports to indicate that it provides the exclusive statutory remedy for discrimination in the insurance business, or otherwise purports to preclude the application of the Civil Rights Act.[17]

---

[17] Of course, it is possible that potential conflicts may arise between the Civil Rights Act and the UTPA with regard to hypothetical cases not now before us. For example, § 2027(a)(i) of the UTPA explicitly states that "marital status may be used to classify individuals or risks for the purpose of insuring family units," and § 2027(c) prohibits:

> Charging a different rate for the same coverage based on sex, marital status, age, residence, location of risk, handicap, or lawful occupation of the risk *unless the rate differential is based on sound actuarial principles, a reasonable classification system, and is related to the actual and credible loss statistics or reasonably anticipated experience in the case of new coverages.* [Emphasis added.]

While such provisions might, at first glance, appear to be potentially in conflict with the broad sweep of § 302 of the Civil Rights Act, it must be recalled that § 302, as it states at the very outset, prohibits discrimination "[e]*xcept where permitted by law* . . . ." (Emphasis added.) Thus, the Legislature, in enacting the Civil Rights Act, appears to have foreseen the possibility of conflict, and to have expressly provided for it.

Nothing in the UTPA, of course, even arguably purports to affirmatively *authorize* or *permit* any form of discrimination on grounds of race or national origin, as alleged in this case. Even if the UTPA were deemed not to reach discrimination in the handling and adjustment of insurance claims, as opposed to the sale of insurance policies and the maintenance of insurance coverage (a question I do not reach), that would not constitute the kind of express *authorization* or *permission* arguably conveyed by the provisions of § 2027 quoted above. The

While the two statutes create separate administrative structures with potentially concurrent jurisdiction over some matters, any indirect conflict that might arguably arise in that regard appears to have been foreseen and dealt with by the Legislature. The Civil Rights Act expressly obligates the Civil Rights Department to "[c]ooperate . . . with . . . state, local, and other agencies, both public and private, including agencies of the federal government and of other states." MCL 37.2602(e); MSA 3.548(602)(e).

Furthermore, the Civil Rights Act instructs the Civil Rights Commission, "[i]n the case of a respondent operating by virtue of a license issued by the state, a political subdivision, or an agency thereof," to "certify to the licensing agency" whenever the commission finds that the respondent person or business has violated the act. "Unless the commission's finding is reversed in the course of judicial review, the finding of the commission may be grounds for revocation of the respondent's license." MCL 37.2605(3); MSA 3.548(605)(3). These provisions clearly envision and mandate coöperation between the Civil Rights Commission and Department and licensing authorities such as the Insurance Commissioner. See n 16.[18]

---

"except where permitted by law" proviso of § 302 obviously cannot be invoked by mere *silence* in some other statute. Contrary to the concurrence's suggestion, see Levin, J., *ante,* pp 445-446, mere differences in reach or coverage between the UTPA and the Civil Rights Act do not, *by themselves,* establish any "conflict" between the statutes.

[18] For these reasons, the Oregon Supreme Court's decision in *Thompson v IDS Life Ins Co,* 274 Or 649; 549 P2d 510 (1976), while perhaps the best case in support of the defendants' position, does not support excluding insurance from the scope of Michigan's public accommodations law. *Thompson* held that insurance was excluded from the scope of Oregon's public accommodations law on the ground that irreconcilable administrative conflicts existed between that law and Oregon's insurance regulation statute. See 274 Or 654. It is not clear that *Thompson* is a persuasive holding even on its own terms, but in any event, whatever conflicts were perceived by the Oregon

Under the familiar rule governing the construction of statutes in pari materia,[19] the more specific statute is generally given precedence over the more general statute. The application of that rule, however, *presupposes the existence of a relevant conflict between the statutes.*

> Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, *the two should be harmonized if possible;* but *if there is any conflict,* the latter will prevail . . . . [2B Singer, Sutherland Statutory Construction (5th ed), § 51.05, p 174. Emphasis added.]

This Court has expressly held that when two statutes appear to apply to a case, "[w]e *must give effect to both acts as far as we can." Grosse Pointe Twp Bd of Ed v Blondell,* 251 Mich 528, 532; 232 NW 375 (1930) (emphasis added). Thus, the fact that there is no relevant conflict between the Civil Rights Act and the UTPA—that both can, indeed, be "give[n] effect"—renders the "specific over the general" rule inapplicable.

Still further underscoring the conclusion that the UTPA does not preclude the applicability of the Civil Rights Act is this Court's unanimous decision in *Boscaglia v Michigan Bell Telephone Co,* 420 Mich 308; 362 NW2d 642 (1984). *Boscaglia* held that the applicability of the Civil Rights Act to an employee's claim for physical, mental, or emotional injuries arising from discrimination was not

court to exist in Oregon law plainly do not exist between Michigan's UTPA and Civil Rights Act with regard to this case. See also n 17.

[19] I agree that the Civil Rights Act and the UTPA, §§ 2027 and 2082, may be viewed as being in pari materia because they both address the underlying issue of invidious discrimination. See, e.g., *Richardson v Jackson Co,* 432 Mich 377, 384; 443 NW2d 105 (1989); 2B Singer, Sutherland Statutory Construction (5th ed), § 51.03, pp 138-141. Furthermore, I accept for purposes of argument the proposition that the UTPA is the more specific and detailed statute as applied to this case.

precluded by the Workers' Disability Compensation Act, MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*, even despite the exclusive remedy provision of that statute, *id.*, § 131. See 420 Mich 316-317. As I have already noted, there is no exclusive remedy provision in the UTPA.[20]

The fact that the Legislature enacted both the Civil Rights Act and § 2027 of the UTPA the same year, far from suggesting that the Legislature intended only one or the other to apply to insurance discrimination, simply indicates to me that the Legislature was especially concerned about civil rights that year and moved on several fronts to address the issue. I see no illogic or redundancy in the fact that both statutes apply to insurance discrimination. On the contrary, the statutes appear to complement each other most effectively.

The UTPA, given its lack of an *express* private cause-of-action remedy, *might,* standing alone, be seriously deficient in terms of the ability of individual victims of insurance discrimination to obtain redress. Given the case backlogs and limited administrative and financial resources that may often afflict governmental commissions and agencies charged with enforcing such statutes, denial of an individual cause of action might effectively amount to denial of any hope for relief at all. Furthermore, while I do not express any firm view on the issue, it appears *possible,* on the basis of a cursory examination of the language of § 2027, that the UTPA might reach only discrimination in

---

[20] Not only do the remedies available under the UTPA not *preclude* the applicability of the Civil Rights Act, but it is well established that a plaintiff bringing a claim under the Civil Rights Act need not even *exhaust* other available remedies in order to take advantage of the direct cause of action expressly provided by the act. See *Boscaglia,* 420 Mich 315 (the act " 'provid[es] for direct access to circuit court for an aggrieved party' "); *Walters v Treasury Dep't,* 148 Mich App 809, 814-815; 385 NW2d 695 (1986); *Marsh v Civil Service Dep't,* 142 Mich App 557, 562-563; 370 NW2d 613 (1985).

the offering of insurance policies or the mainte-
nance of insurance coverage, not, as alleged in this
case, discrimination in the handling and adjust-
ment of a particular claim for benefits.

On the other hand, the extensive administrative
remedies provided by the UTPA, and the expertise
of the Insurance Commissioner in the highly spe-
cialized field of insurance, undoubtedly provide an
extremely useful means by which to address sys-
temic or industry-wide problems in that field, in-
cluding any systemic patterns of discrimination
that may exist or arise. While the Civil Rights
Commission and Department would also appear to
have administrative jurisdiction over such discrim-
ination, their resources are spread much more
thinly across many fields of business, and they
presumably might not enjoy the specialized exper-
tise of the Insurance Commissioner.

In sum, it would seem perfectly sensible that the
Legislature, at about the same time that it enacted
a broadly sweeping civil rights law reaching dis-
crimination in virtually all facets of economic life
and expressly affording a powerful, direct legal
remedy to victims of such discrimination, also
amended the regulatory statute governing a par-
ticular industry to extend the administrative pow-
ers of the regulatory agency in that field to deal
with discrimination coming within its purview.

For these reasons, the UTPA clearly does not bar
the plaintiff's legal cause of action under the Civil
Rights Act.

## VI. THE APPLICABILITY OF THE CIVIL RIGHTS ACT TO DEFENDANTS METROPOLITAN AND HONEYMAN

The most difficult issue in this case is whether
defendants Metropolitan and Honeyman, under
the facts alleged in the complaint, are covered by

the Civil Rights Act. The argument against cover-
age, as stated by the defendants, is that Metropoli-
tan and Honeyman are not alleged to have di-
rectly offered any services to the plaintiff, and
were not, in a formal sense, directly or ultimately
responsible for Basic's denial of the plaintiff 's
claim of benefits.[21] The plaintiff 's complaint, how-
ever, alleges that Metropolitan is an investigation
company licensed to do business in Michigan, that
Honeyman is a licensed Michigan attorney, and
that both were hired as agents of Basic to assist in
investigating and adjusting the plaintiff 's claim.
Thus, the complaint must fairly be read to allege
that Basic relied upon the recommendations of
Metropolitan and Honeyman in deciding to deny
the plaintiff 's claim. Indeed, it is doubtful that
Basic could plausibly maintain otherwise, because
the obvious purpose of hiring investigators and
adjusters is to obtain and rely upon their recom-
mendations.

The complaint collectively charges all three de-
fendants with discriminating against the plaintiff
in the handling of the claim, and thus fairly
alleges at least three complementary theories: (1)
that Metropolitan's and Honeyman's investiga-
tions and recommendations to Basic were tainted
by discrimination, (2) that Basic, even if free of
discriminatory animus itself, relied upon the
tainted recommendations to deny the claim, and
(3) that Basic itself was, in any event, motivated
by discriminatory animus in ultimately denying
the claim. Thus, the complaint must fairly be read
to allege that Metropolitan and Honeyman effec-
tively *caused* Basic to deny the claim, or, to put it
another way, that they effectively denied the claim

[21] See also *Safie Enterprises, Inc v Nationwide Mutual Fire Ins Co,*
146 Mich App 483, 495; 381 NW2d 747 (1985) (adopting the same kind
of argument, but without any detailed analysis in support).

themselves in a proximate, but-for causative sense. Whether Metropolitan or Honeyman did indeed cause the ultimate denial in that sense is a factual question that must be assumed in the plaintiff's favor for purposes of MCR 2.116(C)(8), just as with the underlying factual questions whether Basic, Metropolitan, or Honeyman were motivated by discriminatory animus.[22]

As the Court of Appeals noted, 185 Mich App 216, Metropolitan and Honeyman are indisputably "persons" as defined by the Civil Rights Act in § 103(f). See part II, *ante*, p 462 (quoting § 103[f]). Contrary to the suggestion of the Court of Appeals, however, that finding does not fully address the defendants' argument. Obviously, the relationship between the plaintiff and the defendants, as well as the identity of the defendants, must fall within the scope of the act. The crux of the issue, as argued by the defendants, is whether coverage of Metropolitan and Honeyman is barred by the facts, as characterized by the defendants, that Metropolitan and Honeyman were not directly engaged in offering a service to the plaintiff as a member of the public, and were not formally responsible for the ultimate disposition of his claim. In my view, even accepting the defendants' characterization, the facts alleged by the plaintiff nevertheless state a claim against Metropolitan and Honeyman under § 302 of the act. This is

[22] Metropolitan and Honeyman have filed affidavits contending that they neither knew of nor considered the plaintiff's national origin while investigating and adjusting his insurance claim. While such affidavits are relevant to the defendants' motion for summary disposition under MCR 2.116(C)(10), they are obviously irrelevant to the legal viability of the plaintiff's claim as tested by the motion under MCR 2.116(C)(8). For reasons stated in part I, I would not disturb the trial court's discretionary refusal to grant summary disposition pursuant to MCR 2.116(C)(10), pending further discovery. It should also be noted that the defendants' claim to have been completely unaware of the plaintiff's national origin seems somewhat implausible on the face of it, given the obvious ethnic appearance of the plaintiff's name.

supported by a careful reading of §§ 301 and 302, and by the long-established interpretation of the federal public accommodations law, title II of the Civil Rights Act of 1964, 42 USC 2000a *et seq.*

The requirement that a business' services be "offered . . . to the public" is part of § 301(a)'s definition of the "[p]lace[s] of public accommodation" covered by the act. In this case, the relevant business is Basic and the relevant services are the benefits due under the plaintiff's fire insurance policy. Section 302, however—the central, operative section of the public accommodations provision—is not restricted to prohibiting businesses covered under § 301 from denying their own services to anyone on discriminatory grounds, although that is obviously a central part of its meaning. Rather, § 302(a) states, more broadly, that "*a person* shall not . . . [d]eny an individual the full and equal enjoyment of" the services of any covered business. (Emphasis added.) "Person" is defined by § 103(f), not § 301, and is clearly not limited to the very business entity offering the service, the equal enjoyment of which is denied; rather, as I have noted, § 103(f) plainly encompasses virtually *any* entity or individual, including third parties such as Metropolitan and Honeyman.

Thus, the language of § 302 appears to cover any third parties who allegedly interfere with and thus effectively "[d]eny" an individual's ability to obtain equal enjoyment of a service offered by a business covered under § 301, even if the business itself is wholly innocent of any discriminatory intent, and even if the third parties are not themselves engaged in offering any service to the public. A precisely analogous interpretation of title II has been a settled principle of federal civil rights law for more than a quarter century.

Title II is structured similarly to §§ 301 and 302

of the Civil Rights Act. Section 2000a of the former, like § 301 of the latter, primarily defines the places of public accommodation covered by the law. Section 2000a-2, like § 302, contains the operative prohibition of discrimination:

> No person shall (a) withhold, deny, or attempt to withhold or deny, or deprive or attempt to deprive, any person of any right or privilege secured by section 2000a or 2000a-1 of this title, or (b) intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person with the purpose of interfering with any right or privilege secured by section 2000a or 2000a-1 of this title, or (c) punish or attempt to punish any person for exercising or attempting to exercise any right or privilege secured by section 2000a or 2000a-1 of this title. [42 USC 2000a-2.]

That this prohibition reaches third parties who interfere with a person's ability to enjoy the rights guaranteed by §§ 2000a and 2000a-1 has been settled at least since *United States v Johnson,* 390 US 563; 88 S Ct 1231; 20 L Ed 2d 132 (1968). *Johnson* involved a federal criminal prosecution of

> a conspiracy to injure and intimidate three Negroes in the exercise of their right to patronize a restaurant. The defendants, *who were outsiders, not connected with the restaurant,* [were] charged with having used violence against these Negroes for having received service at the restaurant, the purpose of the conspiracy being in part "to discourage them and other Negro citizens from seeking service" there "on the same basis as white citizens." [*Id.* at 564. Emphasis added.]

The primary issue in *Johnson* was whether

criminal prosecution was precluded by the exclusive remedy provision of title II, § 2000a-6(b). The Court divided five to three in holding that it was not. Relevant to present purposes, however, the Court *unanimously* agreed that title II reached the third-party activity alleged:

> It is, of course, true that § 203(b) of [title II], 42 USC § 2000a-2(b), bars the use of violence against those who assert their rights under [title II], and that therefore a remedy by way of an injunction could be obtained . . . . [*Id.* at 566.]

> [Section 2000a-2] clearly prohibits intimidation and coercion *by third persons as well as refusal of service by a proprietor.* [*Id.* at 569 (Stewart, J., joined by Black and Harlan, JJ., dissenting). Emphasis added.][23]

It is true that this interpretation follows especially clearly from the language of title II, which refers not only to "deny[ing]" or "withhold[ing]" equal accommodations, but also to "depriv[ing]" persons of their rights, and to "intimidat[ing]," "threaten[ing]," "coerc[ing]," or "punish[ing]" persons exercising or attempting to exercise their rights. Section 302 simply prohibits "[d]eny[ing]" a person the full and equal enjoyment of the covered services on discriminatory grounds, and the Civil Rights Act does not offer any definition of that

---

[23] Accord *United States v Original Knights of the Ku Klux Klan,* 250 F Supp 330, 349 (ED La, 1965) (three-judge court) ("§ 2000a-2 of Title II, is not limited to prohibiting discrimination or segregation by the owner or manager of a place of public accommodation"); *id.* at 334 (stating that the Klan defendants in that case "relie[d] on systematic economic coercion, varieties of intimidation, and physical violence in attempting to frustrate the national policy expressed in civil rights legislation," as described in detailed findings of fact, *id.* at 336-344); *United States v Clark,* 249 F Supp 720 (SD Ala, 1965) (three-judge court).

term. "Deny" is a very broad term, however,[24] and it seems inconceivable that § 302 would not cover the same kinds of third-party interferences with a person's enjoyment of equal accommodations covered by title II, upon which § 302 is so clearly modeled.

Nor would there seem to be any principled basis for differentiating between interference taking the form of direct physical violence and interference taking more subtle (but no less potent) forms, such as an investigator's or adjuster's biased recommendation to an insurer regarding a claim.[25] In either case, if the third party's discriminatory action actually results in the victim not being able to enjoy the full and equal benefit of a business service, the victim has effectively been "denied" the full and equal enjoyment of that service.

Indeed, the type of third-party interference alleged in this case would, if anything, seem even *more* appropriately subject to the Civil Rights Act than interference by *unrelated* third parties. The allegation in this case is that Metropolitan and Honeyman interfered with the full and equal enjoyment of services provided by an entity *with whom they specifically contracted to assist in providing such services.* Metropolitan's and Honeyman's lack of formal authority to make the ultimate decision on the plaintiff's claim cannot be dispositive. A hoodlum harassing a black person

---

[24] Synonyms of "deny" include "prohibit," "disallow," "reject," "preclude," and "exclude." *Roget's International Thesaurus* (4th ed), 778.3, p 614. One dictionary defines "deny" in the relevant sense as: "to withhold the possession, use, or enjoyment of . . . *to deny a man his rights.*" *Random House Dictionary of the English Language: Unabridged Edition,* p 387 (emphasis in original).

[25] That the federal cases cited above and in n 23 involved, for the most part, physical violence, merely reflects the turbulent era in which they arose. They do not suggest that direct physical violence is the only form of third-party interference actionable under title II; indeed, the *Ku Klux Klan* case, n 23 *supra,* expressly referred to "economic coercion" and boycotts. See 250 F Supp 334, 339.

for visiting a restaurant, as charged in *Johnson,* likewise has no formal authority to deny the victim the services of the restaurant, but may actually do so nonetheless.

In sum, whether Metropolitan's or Honeyman's alleged discriminatory animus actually caused the ultimate denial of the plaintiff's claim is essentially a factual question, an ordinary problem of proof. It may well be difficult or impossible for the plaintiff to prove the requisite causal link or the underlying alleged animus. Metropolitan and Honeyman may well succeed in obtaining summary disposition of the plaintiff's claim in the trial court pursuant to MCR 2.116(C)(10). But I believe the allegations against them state a legal cause of action under the Civil Rights Act sufficient to survive a motion under MCR 2.116(C)(8).

### VII. CONCLUSION

In *Patterson v McLean Credit Union, supra,* Justice Brennan criticized the "cramped," "pinched," and "parsimonious" interpretation of a federal civil rights law by the majority in that case, stating:

> When it comes to deciding whether a civil rights statute should be construed to further our Nation's commitment to the eradication of racial discrimination, the Court adopts a formalistic method of interpretation antithetical to Congress' vision of a society in which contractual opportunities are equal. [491 US 189 (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting).]

While this case involves an allegation of discrimination on the basis of national origin, the majority's reasoning would apply equally to cases involving bigotry on account of race, religion, gender, or

any other ground specified in the Civil Rights Act. With the substitution of "the Michigan Legislature" for "Congress" in the above quotation, I believe Justice Brennan's criticism applies equally well to the majority's decision in this case.

I dissent.

BOYLE, J. (*dissenting*). I believe this matter should be resubmitted for rebriefing and participation of additional amici curiae and the Attorney General. A majority of the Court not presently agreeing with that view, I concur in the result reached by the Chief Justice and Justice MALLETT. However, because I am unpersuaded that plaintiff's first amended complaint meets the fraud pleading requirements of MCR 2.112(B)(1), I respectfully dissent from the remand of the fraud claim. MCR 2.112(B)(1), which parallels FR Civ P 9(B)(1),[1] requires:

> In allegations of fraud or mistake, the circumstances constituting fraud or mistake must be stated with particularity.

Wright and Miller,[2] discussing fraud pleading in the federal system, list two convincing reasons for particularity in fraud pleading. First, "fraud and mistake embrace such a wide variety of potential conduct that a defendant needs a substantial amount of particularized information about plaintiff's claim in order to enable him to understand it and effectively prepare his response." Second, and perhaps more applicable to this case, "actions . . . based upon fraud are disfavored and are scrutinized by the courts with great care be-

---

[1] The substitution of "allegations" for "averments" is inconsequential.

[2] 5 Wright & Miller, Federal Practice & Procedure, § 1296, pp 580-581.

cause they often form the basis for 'strike suits' "
brought in the hope of forcing defendants to settle
to avoid discovery expenses. Justice SMITH echoed
this concern in a fraud pleading case similar to
the present action: "The amended bill is but an-
other shotgun pleading for which plaintiffs seek a
hunting license."[3]

The above rationale is particularly compelling
here because the plaintiff must plead himself into
the "bad faith" exception to fraudulent misrepre-
sentation. The general rule is "that an action for
fraudulent misrepresentation must be predicated
upon a statement relating to a past or an existing
fact. *Future promises are contractual and do not
constitute fraud.*"[4] (Emphasis added.) To fall
within the bad-faith exception "evidence of fraudu-
lent intent . . . must relate to conduct of the
actor 'at the very time of making the representa-
tion, or almost immediately thereafter.' "[5] In the
present case, the plaintiff fails to allege any fac-
tual evidence to support a bad-faith claim. His
complaint merely lists the definition of fraud and
misrepresentation. To argue "that Kassab's com-
plaint stated the circumstances constituting fraud
with particularity," as the majority does,[6] writes
MCR 2.112(B)(1) out of the Michigan Court Rules
and eliminates the general rule prohibiting fraud
actions in future-promise cases except in ex-
tremely limited circumstances.

[3] *Dutkiewicz v Bartkowiak*, 372 Mich 386, 388; 126 NW2d 705 (1964).

[4] *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976).

[5] *Id.*, pp 338-339.

[6] *Ante*, p 442.